456

Joseph J. RICCI, et al.,
Plaintiffs, Appellees,

v.

KEY BANCSHARES OF MAINE, INC.,
et al., Defendants, Appellees.

Gary E.W. Barnes and Patricia A. Crate,
Personal Representative of the Estate
of William F. Crate, Third Party De-
fendants-Appellants.

Nos. 85–1052, 85–1309.

United States Court of Appeals,
First Circuit.

Argued April 5, 1985.

Decided July 24, 1985.

Gael Mahony, Boston, Mass., with whom John A.D. Gilmore, Richard M. Zielinski, Janet Sanders, Hill & Barlow, Boston, Mass., Thomas E. Peisch, Thomas D. Burns, Burns & Levinson, Boston, Mass., David C. King and Rudman & Winchell, Bangor, Me., were on brief for appellees.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal of the district court's denial of third-party defendants' motions for summary judgment. The third-party defendants, FBI Agents William F. Crate and Garry E.W. Barnes, asserted in their motions for summary judgment that they were absolutely immune from liability on the pendent state common-law claims and that they were entitled to the defense of qualified immunity on the federal statutory claims. The motions were denied because the district court found that there were disputed issues of material fact which precluded a ruling on the immunity of Crate and Barnes as a matter of law. Crate and Barnes appeal these summary judgment denials under the rule of *Krohn v. United States,* 742 F.2d 24 (1st Cir.1984), where we announced that we would take interlocutory jurisdiction of denials of claims of absolute and qualified immunity. *Id.* at 27–29. The Supreme Court has recently put its imprimatur on this procedure. *Mitchell v. Forsyth,* —— U.S. ——, ——, 105 S.Ct. 2806, 2815–2818, 86 L.Ed.2d 411 (1985).

## I. THE FACTS

Crate and Barnes were brought into court as third-party defendants by three banks, Key Bancshares of Maine, Inc., Key Bank of Central Maine, Inc. and Key Bank of Southern Maine, Inc., and two bank officers, Wallace M. Haselton and Bernard K. Holdsworth. The banks and their officers had been sued by Joseph J. Ricci, Gerald Davidson, and their wholly owned corporations on a number of federal and state claims stemming from the banks' refusal to continue to loan money to Ricci and David-

Paula D. Silsby, Asst. U.S. Atty., Portland, Me., with whom Joseph H. Groff, III, Asst. U.S. Atty., and Richard S. Cohen, U.S. Atty., Portland, Me., were on brief, for third party defendants-appellants.

son. Claiming, *inter alia*, that their refusal to continue loaning money to Ricci and Davidson was due to derogatory information about Ricci and Davidson provided by the FBI agents, the defendants brought a third-party action for contribution and indemnity against Crate and Barnes.

During the four-year period prior to the events which led to the lawsuit, Ricci, Davidson and their various corporations had been major customers of the banks. Their businesses, which included a harness racetrack in Southern Maine (Scarborough Downs), residential programs for adolescents with behavioral problems, and a multi-unit apartment building, were heavily dependent upon the availability of credit and, over the four-year period from 1977 through 1981, Ricci and Davidson had borrowed more than a million dollars from the banks, some of it under a million-dollar line of credit agreement covering the period from July 1979 through September 1981. At least two additional loans were made to Ricci and Davidson during October and December of 1981.

Sometime in October of 1981, Depositors Trust Company of Southern Maine, now Key Bank of Southern Maine, became aware of questionable loan transactions involving its President, Marco DeSalle, and a customer of the bank, Gerald Sneider. As a result of this discovery, DeSalle resigned as president in eary November. Around the same time, Conrad Bernier, a bank auditor, contacted the Maine Attorney General's office and the FBI in relation to these questionable transactions and these two agencies began a joint investigation into possible criminal wrongdoing at the bank. In early December, the investigator from the Maine Attorney General's office, Owen Colomb, asked Bernier to compile a list of bank customers with loan balances in excess of $100,000 so that he could sit down with the FBI and determine if the bank's transactions with any other customers ought to be investigated. Colomb was particularly interested in Ricci because he thought his name "rang a bell."

On December 17, 1981, Colomb and another investigator from the Maine Attorney General's office met with FBI Agents Barnes and Crate and they reviewed the list of large borrowers. Colomb stated in his deposition that, after reviewing the list of names, Crate said that the FBI had information tying Ricci to organized crime, that there had been an investigation into race fixing at Scarborough Downs, and that there was unsubstantiated information that Ricci may have set up "Joey Napolitano" when he was hit.[1] According to Barnes, prior to his review of the list, Colomb indicated to him that some interesting names had turned up, including Joe Ricci of Scarborough Downs. In his deposition, Barnes testified that at the December 17 meeting, Crate told Colomb that he was familiar with Joe Ricci as the owner of Scarborough Downs and that "the word was that a Ricci was associated with the death of Little Joe Napolitano." Barnes stated that either he or Crate said at this point that there was no way of knowing whether this was the same Ricci. Barnes also testified that either he or Crate clearly stated that there was no FBI investigation of Ricci. In his deposition, Crate testified that he told Colomb that he had heard that Ricci was connected to organized crime. He also said that he had heard that a Ricci had something to do with the murder of Little Joe Napolitano in New York City a few years earlier.

According to an internal FBI document written by Barnes, Bernier (the bank auditor) called him the next day, December 18, and told him that he had received information that Joe Ricci was connected to organized crime and that the bank was concerned that if they did not approve loans to Ricci that there might be some retaliation. Barnes wrote in the memo that he told Bernier that the FBI could not furnish this kind of information and that this was a

---

**1.** Michael J. "Little Joe" Napolitano was a reputed organized crime figure killed in New York in 1978.

problem that the bank would have to handle. No such conversation was reported by Bernier.

According to Colomb's deposition, however, he did not pass the information concerning Ricci on to Bernier until December 21. Bernier immediately reported this information to Wallace Haselton, the president of Depositors Corporation, now Key Bancshares of Maine. Haselton phoned Colomb and Colomb repeated this information to him. Later on that day, Joel Stevens, the new president of Depositors Trust Company of Southern Maine, also spoke to Colomb about Ricci. On December 21, Haselton instructed Stevens to terminate any lending relationship with Ricci, Davidson, or their corporations. Ricci has claimed that this decision was based upon the information provided by the FBI. The bank has claimed that its decision to terminate the lending relationship was due to a change in lending philosophy resulting from the appointment of a new president and the failure of the Ricci/Davidson corporations to file financial statements with the bank. In any event, Ricci was not informed of this decision until January 8, 1982.

In late December, the bank told Ricci's lawyers about the information they had received from the FBI[2] asking the attorneys not to reveal to Ricci the source of the information. Ricci met with his attorneys on December 29 and vehemently denied the allegations of organized crime connections and race fixing. Within the next week, Ricci's attorney informed the bank officers that Ricci had denied the truth of the FBI allegations. He also contacted Agent Barnes to complain about the allegations and Lawrence Sarhatt, Special Agent in Charge at the Boston FBI office, to arrange a conference to clear Ricci's name and a conference was set for January 19, 1982. On January 11, 1982, Ricci received a letter from Joel Stevens, President of Depositors Trust Company, stating that the bank would not continue to satisfy Ricci's credit needs due to a "shift in ... lending policy."

On January 19, 1982, Agent Crate and his superior, Agent Thomas McGeorge, met with Ricci and his attorney to discuss the allegations made by Crate. At this meeting both McGeorge and Crate told Ricci that they had no personal knowledge that Ricci was connected to organized crime or that he had any involvement in the murder of Little Joe Napolitano. They also indicated that they could not either confirm or deny whether the FBI had a pending investigation of Ricci. Ricci requested that the FBI inform the Portland financial community that the prior allegations were false. This was never done. After this meeting, McGeorge wrote a memo dated February 2 to Special Agent in Charge Sarhatt summarizing the meeting with Ricci. He went on to say:

> It appears that any statements made to banking officials concerning Ricci's reputation could possibly have emanated from other law enforcement personnel. The writer feels that no adverse administrative action is required against any of our people in regards to this matter.

> However, the writer has discussed, at length, the matter with those Agents involved and reminded them that we must constantly exercise extreme caution when engaging other law enforcement people in discussions concerning FBI business.

On the bottom of the memo is a handwritten notation, signed "JS," which says, "I concur. No further action necessary."

At some point it became clear that most of the information about Ricci, in particular the allegations that he was connected to organized crime and the murder of Little Joe Napolitano, pertained to a different Joe Ricci who lived in Massachusetts. It is not clear from the record as it now stands precisely when this became known to Agents Crate and Barnes, but it is quite

---

2. The bank defendants' access to Ricci's lawyers was facilitated by the fact that the same law firm also represented Depositors Trust Company of Southern Maine. The obvious conflict in interest arising out of these events appears to be the subject of a separate lawsuit in state court.

possible that they knew this by the time of the January 19 meeting with Ricci and his attorney. The record does, however, contain a memo from Agent Crate dated early January which indicates that the FBI did have some informant information connecting the Maine Joe Ricci with race fixing at Scarborough Downs.

In mid-February, 1982, Ricci's Boston counsel contacted Wallace Haselton, President of Depositors Corporation, and threatened the bank with a civil suit on behalf of Ricci if the bank did not restore his credit. The attorney told Haselton and the bank's attorney, Frank Chapman, that the FBI information was erroneous. The bank urged the attorney to provide proof of Ricci's innocence. Ricci did not obtain written evidence that the information given to the bank was false until he received a June 3, 1982 letter from FBI headquarters in Washington, D.C. as a result of a request under the Freedom of Information Act. The letter stated that there was no record in Washington that Ricci had been the subject of an FBI investigation. The letter also stated that not all information collected by field offices is forwarded to Washington, such as "cases in which the perpetrators of the violation were not identified; cases in which the United States Attorney declined prosecution; and cases in which the allegations were unsubstantiated or not within the jurisdiction of the FBI."

On February 19, 1982, there was a meeting at the office of Frank Chapman, counsel for the banks, between bank officers and Agent Barnes. Precisely how the meeting was set up, who attended and what was said is a matter of some dispute. According to Barnes' deposition, he had arranged the meeting with Chapman to discuss another client of the bank whom he was investigating. When he arrived for the meeting, Chapman told him that Wallace Haselton wanted to speak with him. At that point both Haselton and Bernard Holdsworth, Vice President and Director of Depositors Corporation, now Key Bancshares of Maine, came to Chapman's office. According to Barnes, when Haselton arrived, he told Barnes that Ricci's Boston

attorney had threatened to sue the bank because it had refused to lend him any more money. Haselton went on to apologize to Barnes for bringing him and the FBI into this matter and proceeded to recount some of the allegations concerning Ricci's connections to organized crime. He then asked Barnes how he felt about this situation and how the FBI felt about it. Barnes testified that he responded that Haselton shouldn't worry about the FBI and that the FBI was very comfortable with its position in this matter. Barnes expressly denied making any positive statements of fact concerning Ricci during this meeting or of making any statement as to what he would say if called upon to testify. Barnes also testified that Owen Colomb of the Maine Attorney General's office was *not* present at this meeting.

According to Attorney Chapman, he arranged the meeting with Barnes through Owen Colomb, since Colomb had been the intermediary. Chapman testified that he told Colomb that the bank needed to have the Ricci information confirmed because they had acted upon it and Ricci was denying the truth of the allegations. He also testified that he asked Colomb to have the FBI check the information again before they met. According to Chapman, Colomb did attend the February 19 meeting, along with Barnes, Haselton and Holdsworth. Chapman testified that he made it clear from the beginning of the meeting that its purpose was for the bank to get the Ricci allegations 'from the horse's mouth,' in particular, the allegations about Ricci's connections to organized crime, involvement in the murder of Little Joe Napolitano, the existence of an active strike force investigation concerning Ricci, and race fixing. According to Chapman, Barnes told them at the meeting that his partner Crate was the source of the information and that he had gotten it directly from him. He also said that he had checked back to make sure it was still accurate. He then went on to reassert the allegations concerning Ricci: he was connected to the Mafia, there was an open FBI file on him, he was involved in

the assassination of Napolitano, he was the subject of a strike force investigation, he was involved in race fixing, and he might be laundering drug money through the treatment centers. Chapman also testified that he told both Colomb and Barnes that if Ricci ever brought a lawsuit that the bank would need both of them as witnesses.

According to Haselton, he had Chapman arrange the meeting with Barnes after the bank was threatened with a lawsuit by Ricci's Boston attorney. Haselton did not indicate who was at the meeting, but he did testify that Barnes told him that the FBI had a long-standing investigation of Ricci and that they had substantial evidence of his involvement in organized crime and the murder of Napolitano. Barnes assured him that this was reliable information and that the FBI was very confident of it.

Holdsworth initially testified that there were two meetings on February 19, one with Colomb and one with Barnes, but he later corrected his deposition testimony to say that there was only one meeting on February 19 and that he, Haselton, Chapman, Colomb and Barnes were present. According to him, the purpose of the meeting was to see if there had been any further developments in what was known about Ricci and to find out what the FBI's position would be if the bank found it necessary to disclose the source of their information. According to Holdsworth's corrected deposition, Barnes told them that Ricci was presently being investigated by the organized crime unit of the FBI, which was represented in Maine by Agent Crate, both with regard to Ricci's involvement in organized crime and the murder of Napolitano. Barnes also said that this information would stand up in court and that the FBI would testify as the existence and nature of their investigation.

Agent Crate testified that sometime in February or March Barnes told him that he was going up to Augusta to talk to the bank about Ricci and that after Barnes came back he said that he had met with a lot more people than he had expected and that as soon as he got there they had

"raked him over the coals" about this matter.

Colomb denies either arranging the meeting with Barnes or attending the meeting and has offered office time records to prove that he was not present.

On February 22, 1982, the bank sent Ricci a letter stating that in order to be considered for any further credit he would have to provide extensive financial statements and would also have to refute any derogatory information which the bank had received. Sometime in July of 1982, after all attempts at resolving the situation out of court had failed, Ricci commenced a lawsuit against the banks, Haselton and Holdsworth.

It would appear that, on the two occasions the FBI agents discussed Ricci, December 17, 1981, and February 19, 1982, it is the latter which provides the bank with the strongest case for indemnity or contribution. Reviewing the record in the light most favorable to the party opposing the motion for summary judgment, *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and indulging all inferences favorable to that party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), there is no evidence that the FBI agents did more than confuse the two Riccis at the December meeting with Colomb. However, at the February 19 meeting, the record suggests that, at the very least, Barnes negligently failed to set the record straight as to the Ricci allegations or, at the worst, deliberately lied to the bank even though he knew the information was incorrect. For purposes of our immunity analysis, therefore, we will focus upon the events of February 19, 1982.

## II. THE COMMON-LAW CLAIMS—ABSOLUTE IMMUNITY

We shall focus our analysis of the FBI agents' immunity from the common-law claims upon defendants' allegation that the agents either negligently or intentionally misrepresented Ricci's criminal backround

to them. The misrepresentation charges are the basis for the defendants' claim of a right of indemnity against the agents. The defendants allege that the misrepresentations constituted tortious conduct vis-a-vis them and they are entitled to recompense for any injury suffered by them on account of their reliance upon these misrepresentations. Technically, we should also evaluate the agents' immunity from liability for interference with contractual and advantageous relationships, negligence, defamation and intentional infliction of emotional distress because the defendants have also claimed a right of contribution from the agents for any torts for which they may be liable to Ricci. However, we need not devote a separate analysis to these four additional torts. The underlying acts are the same regardless of the legal theory and our analysis of both an intentional and negligent tort covers the same range of conduct as the four additional torts also at issue in the case. For simplicity's sake, therefore, the analysis will focus upon the claims of misrepresentation with the understanding that it applies equally to the other torts as well.

■ It is now well-settled that the immunity available to federal officials charged with committing common-law torts is absolute, not qualified. *Harlow v. Fitzgerald*, 457 U.S. 800, 807–08, 102 S.Ct. 2727, 2732–2733, 73 L.Ed.2d 396 (1982); *Butz v. Economou*, 438 U.S. 478, 489–95, 98 S.Ct. 2894, 2902–2905, 57 L.Ed.2d 895 (1978). The scope of this immunity is such that it cannot be defeated by allegations or proof of deliberate malice on the part of the federal official so charged, *Barr v. Matteo*, 360 U.S. 564, 571–75, 79 S.Ct. 1335, 1339–1342, 3 L.Ed.2d. 1434 (1959), as long as the conduct in question falls within the "outer perimeter of [the official's] ... line of duty." *Id.* at 575, 79 S.Ct. at 1341. While it might seem that deliberately malicious conduct ought not be considered to fall within the scope of a federal official's duty, failure to include such conduct under the protection of the privilege would require federal officials to work "under an apprehension that the motives that control

... official conduct may, at any time, become the subject of inquiry in a civil suit for damages." *Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896). Although this concept of absolute immunity allows some abuses of official power to go unredressed, it is necessary for the effective administration of government that government workers be able to perform their jobs without fear of liability. *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949). *Compare Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (eliminating inquiry into subjective motivation for defense of qualified immunity for similar reasons). Consequently, the malicious nature of the conduct is, for purposes of immunity analysis, irrelevant. The conduct need only be the *kind* of action which, if done for legitimate purposes, falls within the scope of the official's authority. *Gregoire*, 177 F.2d at 581.

■ The requirement that conduct protected by absolute immunity falls "within the outer perimeter of [the official's] ... line of duty" is read fairly expansively. The conduct in question need only be more or less connected to "the general matters committed by law to his [or her] control or supervision" and not "manifestly or palpably beyond his [or her] authority." *Spalding*, 161 U.S. at 498, 16 S.Ct. at 637. While the privilege of absolute immunity is available to low-ranking and high-ranking officials alike, *Barr*, 360 U.S. at 572–73, 79 S.Ct. at 1340–1341, conduct which would not be immunized at a higher level cannot be immunized by delegating it to a lower official and making it a mandatory duty, *Doe v. McMillan*, 412 U.S. 306, 322–23, 93 S.Ct. 2018, 2029–2030, 36 L.Ed. 912 (1973). In such a case, the scope of immunity is determined with reference to that of the higher official. *Id.* at 323, 93 S.Ct. at 2030.

There does not seem to be any question here that the FBI agents, in exchanging information with the bank about one of its large loan customers, were acting within the "outer perimeters" of their authority. Here, the bank was cooperating with the

FBI in an investigation of loan practices which were both irregular and detrimental to the bank's fiscal stability. Ricci was the largest customer of the bank, holding over $700,000 in loans secured by various assets. If Ricci had been associated with organized crime, the bank ran the risk of having its security for the loans seized under RICO. 18 U.S.C.A. § 1963(a) & (b) (1985). To the extent that the FBI was concerned with the stability of the bank, in addition to any possible criminal wrongdoing on the part of bank officers, it had the authority to exchange information with bank officials. 28 C.F.R. § 0.85(j) (1984). For purposes of this analysis, it does not matter that the information actually exchanged was incorrect, since it was certainly within the power of the FBI to provide the correct information.

There may also be another requirement for the grant of absolute immunity from common-law liability. At common law, absolute immunity was limited to public officials performing discretionary duties involving policy-making or judgment and was not available to officials performing merely ministerial duties who were negligent in the performance of these duties. 5 K. Davis, *Administrative Law Treatise* § 27:18 (2d ed. 1984). Early Supreme Court cases explicitly adopted this doctrine, *see, e.g., Kendall v. Stokes*, 44 U.S. 87, 98, 3 How. 87, 98, 11 L.Ed. 506 (1845) ("[b]ut a public officer is not liable to an action if he falls into error in a case where the act to be done is not merely a ministerial one, but is one in relation to which it is his duty to exercise judgment and discretion"). In

light of this, a few circuits have adopted a second test for absolute immunity which requires that conduct be discretionary in nature in addition to being within the "outer perimeter" of authority.[3]

While this test has become the touchstone for determining sovereign immunity under the Federal Torts Claims Act, 28 U.S.C. § 2680(a) (1982), and has recently emerged as a factor in the analysis of qualified immunity, *Davis v. Scherer*, —— U.S. ——, ——, 104 S.Ct. 3012, 3021 n. 14, 82 L.Ed.2d 139 (1984) (stating that there is a "ministerial duty" exception to qualified immunity), there remains some question as to whether such an exception still exists in the absolute immunity context. Although some courts have found a basis for this requirement in *Barr v. Matteo, e.g., Johnson v. Alldredge*, 488 F.2d 820, 824 (3d Cir.1973), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), we do not. In *Barr*, the Court did not focus any special attention upon the fact that the conduct involved was *discretionary* as opposed to *ministerial*, probably because the conduct in question, the distribution of a press release by the Acting Director of the Office of Rent Stabilization, was quite clearly discretionary. To the extent that the court did discuss discretion in its opinion, its concern was with making it clear that discretionary conduct, as long as it remains within the scope of discretion entrusted to the official, is as important to protect from the "attacks" of state law[4] as conduct which has been explicitly authorized by federal law;

---

**3.** *See, e.g., Dretar v. Smith*, 752 F.2d 1015 (5th Cir.1985) (supervision of employees held to be a discretionary function); *Araujo v. Welch*, 742 F.2d 802 (3d Cir.1984) (work-related discussion between Army Major General and a civilian worker under his supervision held to be an exercise of a discretionary function); *Strothman v. Gefreh*, 739 F.2d 515 (10th Cir.1984) (allegedly false and malicious competency rating of ALJ in Charge involved "policy decisions and judgment and ... [was] not made pursuant to a fixed standard or mandatory operational duty"); *Davis v. Knud-Hansen Memorial Hospital*, 635 F.2d 179 (3d Cir.1980) (negligent medical treatment is ministerial conduct); *Tindall v. Moore*, 417 F.Supp. 548 (N.D.Ga.1976) (negli-

gence of foreman at prison mattress factory did not involve a discretionary act); *Byrd v. Warden, Federal Detention Headquarters*, 376 F.Supp. 37 (S.D.N.Y.1974) (negligent decision of prison safety officer not to issue safety goggles to prison workers was not discretionary).

**4.** "The legislation of a State may be unfriendly. It may affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws. It may deny the authority conferred by those laws." *Tennessee v. Davis*, 100 U.S. 257, 263, 10 Otto 257, 25 L.Ed. 648 (1879).

[t]hat petitioner was not *required* by law or by direction of his superiors to speak out cannot be controlling in the case of an official of policy-making rank, for the same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.

*Barr,* 360 U.S. at 575, 79 S.Ct. at 1341. Thus, on our reading, the modern Supreme Court has not yet put its imprimatur upon a "ministerial duty" exception to absolute immunity. However, we may not need to tackle this question here. If the conduct before us is discretionary, the availability of absolute immunity is well established.

The question we must consider, then, is whether the conduct of the FBI agents was essentially discretionary or ministerial in nature. The defendants have charged that the FBI agents either intentionally or negligently misrepresented that Ricci had a criminal background and that he was being actively investigated by the FBI. In the context of qualified immunity, the Supreme Court has said that a law which fails to specify the precise action to be taken creates only discretionary authority. *Davis v. Scherer,* —— U.S. ——, ——, 104 S.Ct. 3012, 3021 n. 14, 82 L.Ed.2d 139 (1984). It is clear that there was no law or regulation which precisely specified that the agents were to report information of this kind to banking institutions. The record shows, in fact, that their supervisors felt that the agents should think twice about sharing this kind of information with even other law enforcement personnel. Thus, we are not dealing with an official whose sole duty is to relay information, such as a clerk. The decision to speak to the bank officials about Ricci was clearly a discretionary act upon the part of the FBI agents.

It could be argued, however, that the actual reporting of the information, once the decision was made, was merely ministe-rial; the failure of Barnes to either tell the truth or check the information as requested could be considered not to involve judgment of the kind exercised in discretionary acts. *Accord Briscoe v. Lahue,* 460 U.S. 325, 366 n. 39, 103 S.Ct. 1108, 1132 n. 39, 75 L.Ed.2d 96 (1983) (Marshall, J., dissenting) (no discretion involved on the part of police-witnesses in answering questions fully and truthfully). However, breaking down discretionary acts by a single person into discretionary and ministerial components would seem to vitiate much of the protection of discretionary action which absolute immunity was designed to provide. As Judge Learned Hand pointed out in *Gregoire v. Biddle,* "[t]he justification [for absolute immunity] . . . is that it is impossible to know whether the claim [of misconduct] is well founded until the case had been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." 177 F.2d at 581. A negligent mistake by an official in the course of a discretionary action can result in conduct which is indistinguishable from conduct which is the result of poor judgment or even deliberate malice. Allowing liability for conduct which results from simple negligence would require, as an initial matter, that there be a determination of the source of the error. Such an investigation, including discovery on the decision-making process, would create just the kind of "chilling" effect upon "the effective functioning of government" that absolute immunity was designed to prevent. Thus, although negligence upon the part of government officials engaged in discretionary functions should be discouraged, considering the broad range of harm which may result, it is nonetheless necessary that such officials not have the sword of liability hanging over them. Of course, this is not the case where discretionary functions and ministerial actions are performed by different people. The effective functioning of government will not be harmed by allow-

ing officials whose sole function is to perform ministerial tasks to be held liable for the negligent performance of those tasks. Discretionary conduct will not be "chilled" and negligence will be deterred. If anything, this will promote the effective functioning of government.

■ We find, therefore, that even if absolute immunity from common-law liability is limited to government conduct which is discretionary in nature, the conduct of the FBI agents, whether it involved malice or negligence, was essentially discretionary in nature and cannot be made the basis of common-law liability. The agents are immune from any claim of contribution or indemnity arising out of common-law causes of action and those counts of the defendants' complaint should have been dismissed by summary judgment.

## III. THE FEDERAL STATUTORY CLAIMS—QUALIFIED IMMUNITY

Ricci has also alleged that the defendants are liable to him under four federal statutes: the Equal Credit Opportunity Act, 15 U.S.C.A. §§ 1691–1691f (1982 & Supp.1985); the Fair Credit Reporting Act, 15 U.S.C.A. §§ 1681–1681t (1982 & Supp. 1985); the Civil Rights Act, 42 U.S.C. § 1981 (1982); and the Civil Rights Act, 42 U.S.C. § 1983 (1982). The defendants, in turn, have sought contribution from the FBI agents for any liability they may incur under these federal statutes. The FBI agents moved for summary judgment, claiming that they were immune from any liability arising under these statutes. The district court denied the motion, finding that there were factual disputes which precluded the resolution of this issue at summary judgment. The agents have appealed this denial with respect to three of the four statutory bases of liability: the Fair Credit Reporting Act, the Equal Credit Opportunity Act, and § 1981. The agents have not appealed the denial of summary judgment under the § 1983 claim. *See* Government's

Brief at iii n. 1. The issue here is whether the agents are immune from any civil liability which might arise out of the contribution action.

■ Whether the possible liability of the agents is viewed as flowing from a right of contribution held by the defendants or, more derivatively, out of the "joint tortfeasor" status of the agents under the federal statutes enumerated above, it is clear that the basis of liability is federal law and not state common law.[5] Although some government officials do enjoy absolute immunity from civil liability arising out of violations of federal statutory or constitutional rights because of the "public interest in the special functions" they perform, *Harlow v. Fitzgerald*, 457 U.S. 800, 812, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982), most government officials exercising discretionary functions enjoy only qualified immunity for violations of federal statutory or constitutional rights. *Id.* at 807, 102 S.Ct. at 2732. FBI agents, like all law enforcement officials, do not perform the kind of special function which requires the protection of absolute immunity. *Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967); *Maiorana v. MacDonald*, 596 F.2d 1072, 1074 (1st Cir. 1979).

■ Under *Harlow*, qualified immunity is available only where the official's conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818. In this case, the statutory rights relevant to the analysis of immunity are not the defendants' right of contribution against the FBI agents, but rather the underlying statutory rights of Ricci, which the defendants allege were violated, if at all, by both the defendants and the FBI agents. However, because this is a contribution action, and not a direct action against the agents by Ricci, the statutory rights alleged to have been violated by the FBI are limited to the statutory rights al-

---

**5.** A right to contribution for liability arising from a violation of a federal statute is a matter of federal law. *Northwest Airlines, Inc. v.* *Transport Workers Union,* 451 U.S. 77, 90–91, 101 S.Ct. 1571, 1580–1581, 67 L.Ed.2d 750 (1981).

leged to have been violated by the defendants. For the purposes of a *Mitchell* review, we must assume that there is liability upon the part of the defendants. However, without knowing on precisely what grounds, if any, the liability of the defendants will be based, it is difficult to determine whether there are "clearly established" statutory rights vis-a-vis the FBI agents. For purposes of this review, therefore, it will be necessary for us to make an "educated guess" as to the basis of liability under each statute.

We first consider the FBI agents' claim of immunity from Ricci's claim of violations of both the Equal Credit Opportunity Act and the Fair Credit Reporting Act. Our focus is upon whether there are "clearly established" statutory rights with which the FBI agents could have been expected to be familiar. We begin with the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681t. The Act requires that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information...." 15 U.S.C. § 1681(b). Under the Act, a "consumer reporting agency" is defined as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." *Id.* at § 1681a(f). The violations of this statute alleged by Ricci are a failure to accurately report the substance and source of information available as required by § 1681g(a), a failure to inform Ricci that an investigative consumer report was being prepared as required by § 1681d(a), and a failure to use reasonable procedures to assure maximum accuracy of all information under § 1681e(b).

■ We shall assume, for the purposes of our very limited analysis here, that the defendants will be found to have violated Ricci's rights under the Fair Credit Reporting Act. The question relative to the immunity of the FBI agents is whether these violations can also be considered to be violations of "clearly established" statutory rights by the FBI agents. We do not see how they can be. The FBI is not a "consumer reporting agency" as defined under the statute. *Ollestad v. Kelley*, 573 F.2d 1109, 1111 (9th Cir.1978). Clearly, FBI agents cannot be reasonably expected to conform their conduct to the mandates of statutes which do not apply to them. We must conclude, therefore, that the agents are immune from any liability arising out of violations of the Fair Credit Reporting Act.

■ We reach a similar conclusion with regard to the claims made under the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691–1691f. Under this Act, "[i]t shall be unlawful for any creditor to discriminate against any applicant with respect to any aspect of a credit transaction ... on the basis of race, color, religion, national origin, sex or marital status, or age...." 15 U.S.C. § 1691(a). A "creditor" is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." *Id.* at § 1691a(e). Obviously, the FBI cannot be considered to be a "creditor" as defined by the Act and its agents cannot reasonably be expected to conform their conduct to the Act. As a result, the FBI agents must be considered to be immune from any liability arising out of violations of the Equal Credit Opportunity Act.

42 U.S.C. § 1981 provides the third basis of "joint liability" claimed by the defendants. The statute provides that

all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Once again our concern is whether those rights alleged by Ricci to have been violated by the defendants were so clearly established that the FBI agents could reasonably have been expected to be aware of them. Ricci's claim against the defendants is that he was denied a right to contract for credit because of his national origin, Italian-American, and the association of that national origin with organized crime. A review of the available precedent, however, indicates that it is doubtful that § 1981 provides any protection against discrimination based solely upon national origin. The Supreme Court has reserved decision on this matter, *Delaware State College v. Ricks*, 449 U.S. 250, 256 n. 6, 101 S.Ct. 498, 503 n. 6, 66 L.Ed.2d 431 (1980), and those circuits which have addressed the issue have found that national origin discrimination is only cognizable under § 1981 when linked to racial discrimination based upon some physiological characteristic, an allegation not present here. *E.g., Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 50 (7th Cir.1984) (held that national origin discrimination absent "allegation of racial animus" cannot support cause of action under § 1981); *Keating v. Carey*, 706 F.2d 377, 383–84 (2d Cir.1983) (dicta that § 1981 protections are limited to racial as opposed to national origin discrimination); *Bullard v. Omi Georgia, Inc.*, 640 F.2d 632, 634 (5th Cir.1981) (holding that § 1981 "does not encompass discrimination based solely on national origin"); *Gonzalez v. Stanford Applied Engineering, Inc.*, 597 F.2d 1298 (9th Cir.1979) (permitting claim by Mexican-American under § 1981 where allegation of discrimination because of brown skin color). *But cf. Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968 (10th Cir.1979) (although Mexican-Americans not technically another race, community attitudes differentiating Hispanics from "Anglos" are sufficiently akin to racial prejudice to bring discrimination against Mexican-Americans within § 1981).

 Our own circuit has not yet had the opportunity to address this question. Given the limited nature of our review in this case and the necessarily narrow briefing such a review elicits, we do not make any holding here concerning whether a claim of national origin discrimination, without any allegations of racial prejudice, states a cause of action under § 1981. In fact, we do not believe that this question is properly before us. We must hold, however, that, based upon our review of nationwide precedent, such a cause of action is not clearly enough established to warrant finding that the FBI agents have lost their qualified immunity. It does not matter that national origin discrimination might be clearly prohibited by another statute or constitutional provision, because "[n]either federal or state officials lose their immunity by violating the clear command of a statute or regulation—of federal or state law—unless that statute or regulation provides the basis for the cause of action sued upon." *Davis v. Scherer*, —— U.S. ——, ——, 104 S.Ct. 3012, 3020 n. 12, 82 L.Ed.2d 139 (1984). We hold, therefore, that the FBI agents are immune from any liability arising under § 1981.

We hold here that the FBI agents are immune from liability arising out of both the common-law causes of action and the three federal statutory causes of action appealed. The district court improperly denied the motions for summary judgment on these grounds.

*Reversed and Remanded.*