Bancroft Dudley HALL, et
al., Plaintiffs,

v.

Frederick J. OCHS, et al., Defendants.

Civ. A. No. 81–333–K.

United States District Court,
D. Massachusetts.

Nov. 27, 1985.

John Reinstein, Civil Liberties Union of Mass., Michael Avery, Howard Friedman, Friedman & Atherton, Boston, Mass., for plaintiffs.

Robert D. O'Leary, Quincy, Mass., Philip M. Cronin, Devra G. Bailin, Boston, Mass., for defendants.

KEETON, District Judge.

Plaintiffs Bancroft Dudley Hall and his daughter, Sandra Hall, brought this action against defendants Town of Milton and Officers Ochs, Judge, Murphy, and Rogers of the police force of the Town, as well as other officers who were dismissed at the commencement of trial. The claims asserted include battery on each plaintiff, false imprisonment of the father, and violations of rights of both plaintiffs remediable under 42 U.S.C. § 1983. All these claims arose out of an incident occurring when the father, on Sunday morning, came to a residential neighborhood to pick up his daughter after her overnight stay with a school classmate. The suspicions of a neighbor's daughter, who drove past and observed the plaintiffs, Blacks, led the neighbor to call the police, who arrived just as Sandra Hall was entering her father's car and they were about to leave.

The jury (in answer to interrogatories) found for plaintiffs on the claims for battery and on a claim for false imprisonment of the father from the time he was arrested in the driveway until defendant Murphy advised him, at the police station to which he had been taken after arrest, that he would be freed immediately if he would sign a form presented to him, releasing all claims against all the defendants. The court ruled at the close of the evidence that, as a matter of law, defendant Murphy and the Town of Milton were liable for false imprisonment of the father from the time defendant Murphy first presented the release form to the father until the time (at the least, nearly an hour later) when the father signed the form and was freed from police custody. The jury found that the other individual defendants were jointly liable with Murphy and the Town for this false imprisonment. The court also ruled that under the undisputed evidence, the police officers were acting pursuant to Town policy in using the release form as they did, thus rendering the Town subject to liability for attorneys' fees under 42 U.S.C. § 1988. The jury found against all individual defendants on the § 1983 claims and awarded punitive damages against each individual defendant. Judgment was entered on the verdict for compensatory damages of $165,000, prejudgment interest of $86,883.89, punitive damages of $210,000, attorneys' fees of $61,623.75, and expenses of $2,188.38, for a total of $525,696.02.

Each of the defendants in this case has filed a motion for judgment notwithstanding the verdict and a motion for new trial. Jointly they have filed a 59-page Memorandum in support of their motions.

With the exception of contentions addressed below, the motions are founded on arguments that were fully considered before challenged rulings were made in pretrial proceedings or during trial. On those matters, I adhere to the rulings previously made, for the reasons stated of record oral-

ly at trial or in memoranda before trial. This Opinion considers an issue not previously addressed (the sufficiency of the evidence to support the findings on damages) and issues as to which somewhat more elaborate arguments have been presented on these motions than during previous proceedings.

## I.

Neither at trial nor in the present motions have the defendants called attention to any particular deficiency in the evidence that would support their arguments that the evidence was insufficient to support any of the factfindings on liability made by the jury in answering the interrogatories submitted to them in the Verdict form. Nor have I been able to identify any such deficiency. I conclude that the evidence was sufficient to support each of the jury's findings.

Also, the contention that these findings of the jury are against the weight of the evidence is without merit. Clearly clashing versions of the events at issue were presented in the evidence. It was for the jury to decide these disputes of fact, and the jury has done so in a way amply supported by evidence.

## II.

Defendants rely heavily upon the release signed by the plaintiff, Bancroft Dudley Hall (often referred to herein as "plaintiff"). Authorities cited in support of the defendants' argument that this release is valid, and their argument in the alternative that validity depended on a question of fact regarding voluntariness that should have been submitted to the jury, fail to support either of these contentions. A critically important distinction is that of all the cases cited (with the possible exception of early Massachusetts cases decided long before Supreme Court and Circuit decisions of the 1960s and 1970s) none involved circumstances in which the person signing the release was then held by the police, under arrest, and was given a two-fold choice of (1) signing a full release of all claims (not merely a waiver of the right to be bailed) at which time he would be discharged from custody immediately, or (2) declining to sign, in which event he would be held in police custody, under arrest, for a minimum of the substantial period of time required to arrange bail on a Sunday afternoon. This was precisely the limited choice presented to plaintiff.

The material circumstances of the defendants' placing the release form before plaintiff were not in dispute. As described by defendant Murphy in full and corroborated by the testimony of other defendants who were present and participating from time to time, and without contradiction by any evidence from any source, defendant Murphy told plaintiff he could leave immediately if he would sign the release. Then, after plaintiff declined to sign at that time, defendants held him in custody for a substantial additional time.

In view of defendant Murphy's clear and unambiguous testimony on this matter, I conclude that the release was invalid as a matter of basic contract law. When undisputed evidence discloses that the signing of the alleged contract (here, an alleged release) occurred only after the signer was illegally confronted with this coercive choice, while illegally imprisoned, no fact question of "voluntariness" is presented. As a matter of contract law, a release signed under these circumstances of duress is unenforceable. *Restatement (Second) of Contracts*, § 175 (1981). Some courts have held such releases void as against public policy. *See, e.g., Boyd v. Adams*, 513 F.2d 83, 88 (7th Cir.1975) and state cases cited therein at 87 n. 5. Even though dicta in *Horgan v. Boston Elevated Railway Company*, 208 Mass. 287, 289, 94 N.E. 386, 388 (1911), and *Keefe v. Hart*, 213 Mass. 476, 481–82, 100 N.E. 558, 559 (1913), might be read as supporting a different position, they certainly do not so hold. Current Massachusetts contract law is more likely to adhere to the *Second Restatement* position than to any contrary inferences drawn from near turn-of-the-century dicta.

■ As a second, independent ground of holding the purported release invalid as a matter of law, I conclude that both state constitutional law and federal constitutional law require this result. The reason is that plaintiff and defendants were not bargaining as equals. This was a release taken by officers holding the plaintiff in custody under color of law. *See, e.g., Brewer v. Blackwell*, 692 F.2d 387, 399 (5th Cir.1982) ("If in fact [defendant] required the plaintiffs to sign the agreement before releasing them, he deprived them of their right to liberty by threatening to detain them unless they signed it."); *Boyd v. Adams*, 513 F.2d 83, 87–88 (7th Cir.1975) (release signed by plaintiff while still on conditional cognizance bail invalid due to "inherent coercion"); *MacDonald v. Musick*, 425 F.2d 373, 377 (7th Cir.1970) (divided court granted writ of habeas corpus where prosecutor conditioned dismissal of drunk driving charge on petitioner's stipulation that there was probable cause for arrest); *Horne v. Pane*, 514 F.Supp. 551, 552 (S.D. N.Y.1981). ("It seems to us beyond question that a criminal defendant forced to choose between being prosecuted on criminal charges on the one hand, and not being prosecuted but giving up certain constitutionally guaranteed civil rights on the other, cannot as a matter of law make an uncoerced choice.") *Also see* the opinions in *Dixon v. District of Columbia*, 394 F.2d 966 (D.C.Cir.1968) (considering a retaliatory prosecution initiated because defendant refused to promise or reneged on promise not to file a complaint against the police).

In ruling at this time on the validity of the purported release signed by plaintiff, I must also take account of the decision of the First Circuit in *Blackburn v. Snow*, 771 F.2d 556, (1st Cir.1985), even though that decision was not released until after the verdict in this case. The right at issue there (to visit a relative in prison) was assumed by the court not to be a constitutional right. Nevertheless, the opinion of the court (though over a dissent), declares:

> We need not decide whether, as a factual matter, the particular circumstances of Blackburn's background rendered any consent she gave ineffective, for we agree with the district court that, as a matter of law, Blackburn's submission to the [strip] searches under these circumstances cannot properly constitute consent because her access to the Jail was impermissibly conditioned on that submission....

> Rather it has long been settled that government may not condition access to even a gratuitous benefit or privilege it bestows upon the sacrifice of a constitutional right....

*Id.*, at 568. For far stronger reasons, of course, defendants could not condition plaintiff's Fourth (and Fourteenth) Amendment right to release from arrest upon his signing away his claims for harm already done to him, as well as signing away his First Amendment rights to redress of grievances in court. Because of these factual distinctions between this case and *Blackburn*, I conclude that the decision I reach here is consistent not only with the court's opinion in that case but as well with the dissent of Judge Aldrich, at 573–78.

Even if defendants had probable cause when they arrested (an assumption contrary to jury findings in this case), when they subsequently obtained additional information and no longer had probable cause to continue to hold the person under arrest, they were forbidden by state and federal constitutional law to require, as a condition of discharge from custody, that plaintiff sign a release of his claims against them for what they had already done.

■ Thus, under state tort law Murphy was liable as a matter of law for this period of detention (the period between the time he presented the release to plaintiff, having determined to let plaintiff go immediately if he would sign, and the time plaintiff later signed and was discharged). On this state tort claim, a verdict was directed against Murphy and the Town on the issue of liability, and only the issue of damages was submitted to the jury. As to the other police officer defendants, the jury having

found (with ample support in the evidence) that they acted jointly with Murphy in holding plaintiff during this period, they, too, are jointly liable with Murphy and with each other for this period of false imprisonment.

Thus, the defendants are liable for false imprisonment of plaintiff at least from the time he refused to sign the release when it was first presented until he later yielded to what was, in these circumstances, coercive detention as a matter of law, and signed the release form.

Defendants' reliance upon cases in which releases were signed while the plaintiff was not in custody is entirely misplaced. In such circumstances, the threat to the accused person's liberty is a threat of detention at a future time, and only in the event the accused person is found guilty at trial. In this case the coercion that defendants used against plaintiff was not a mere threat but a declared certainty that they would continue to hold him under arrest immediately, no matter how improbable it was that he would be convicted of any offense if tried.

Defendants' reliance upon provisions of the Massachusetts Law Enforcement Officers Handbook is likewise misplaced. Defendants cite, for example, a passage in that Handbook declaring:

If for any reason you decide to release an arrested person without bringing him into court (except on bail), advise him of his right to be brought into court and ask him to sign a waiver of that right.... 

Massachusetts Law Enforcement Officers Handbook, p. 40, at paragraph B [T. 4/23–28]. Defendants proceed to argue as if the release form they presented to plaintiff did not purport to be anything more than a "waiver of that right"—that is, "his right to be brought into court...." This argument must not be allowed to divert attention from the contrast between the "waiver" referred to in the Handbook and the release defendants presented to plaintiff. Defendants never proffered any evidence that they presented such a limited waiver form to plaintiff. Instead, their own evidence is explicit and clear that the only "waiver" form they presented to him was one which purported to release *all his rights against defendants*, not merely his "right to be brought into court."

Also without merit is defendants' argument that there was a material dispute of fact because defendant Murphy held open the possibility of releasing plaintiff on bail. Even assuming that the evidence would support such a factfinding, it nevertheless is undisputed in the circumstances of this case that plaintiff would have been held under arrest at least as long as did occur and probably substantially longer before he could have obtained a hearing before a bail commissioner. Thus, the undisputed fact remains that defendant Murphy presented plaintiff with a choice only between (1) immediate release if he would sign away his rights, and (2) remaining under police arrest for a substantial additional period of time.

In relation to the foregoing argument, defendants clearly misstate the evidence in saying that defendant Murphy "told Hall on at least two occasions that Hall had a right to go to court tomorrow, a right to bail *now* or he could sign the release and leave without having to appear in court." Defendants' Memorandum at 32–33 (emphasis supplied). *See also* the repetition of the "bail now" argument, *id.* at 34–35. Indeed, if defendant Murphy had said "now," it would have been a clear misrepresentation since it is undisputed that substantial time would have been required to obtain a bail commissioner.

As noted above, the invalidity of the release is established as a matter of law on undisputed testimony by defendants. A factfinder's crediting other evidence in the case rather than this testimony would only add additional weight to grounds already sufficient as a matter of law to require the conclusion that the release was invalid.

### III.

Distinct from the issue of validity of the release, referred to in Part II above, is the

issue of "good faith immunity." This is a closer issue, and especially so in relation to the police officer defendants other than defendant Murphy.

First, I turn to clarifying the issue.

Insofar as defendants contend that the law "does not support the conclusion that delivering a release such as that given to Hall violated a clearly established *constitutional* right," Defendants' Memorandum at 15 (Docket No. 117) (emphasis supplied), their contention misses the mark. The serious violation of constitutional right found in this case is not aptly described as "delivering" or "giv[ing]" a release to plaintiff Hall for signature. Rather defendants held plaintiff Hall in custody under color of law after they had determined, and so advised him, that they would discharge him immediately if he would sign the release they placed before him but would continue to hold him in a jail cell (or elsewhere in the police station) if he declined to sign.

In relation to "good faith immunity," the court must consider these contentions of the individual defendants (that is, defendants other than the Town of Milton) that they are protected under the standards for applying that defense as developed in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); *Mitchell v. Forsyth,* — U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); and First Circuit decisions, including, most recently, *Blackburn v. Snow,* 771 F.2d 556, (1st Cir.1985); *Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456, (1st Cir.1985); *Floyd v. Farrell,* 765 F.2d 1, (1st Cir.1985). *See also Briggs v. Malley,* 748 F.2d 715 (1st Cir.1984), and *B.C.R. Transport Co. v. Fontaine,* 727 F.2d 7 (1st Cir.1984). Defendants are mistaken in arguing, however, that validity of the release is the constitutional right at issue. The issue is, instead, whether the conduct of defendants in holding plaintiff Hall in custody violated liberty interests that were "clearly established ... constitutional rights of which a reasonable person

would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 (citations omitted).

█ Even if it could be said that defendants had a reasonable basis for believing that the release would be effective to protect them against liability if they could obtain the plaintiff's signature on it—a belief that would be contrary to the conclusion stated in Part II above—this would not support the further conclusion that they had a reasonable basis for believing they would not be violating a constitutional right if they used detention under color of law to pressure plaintiff into signing, after they had already determined that they would assert no basis for holding him in custody any longer if he would sign the release. The constitutional right at issue is a fundamental liberty interest—not an interest in the validity of a purported contractual document. It is the interest in not being held in confinement under color of law by police officers who have determined that their asserted earlier probable cause for arrest and detention did not justify holding plaintiff any longer. Defendants have cited no authority that even suggests that it would be reasonable for police officers to believe that continuing to hold a person in custody in these circumstances is not a violation of that person's clearly established constitutional right not to be held by police under arrest without probable cause.

Defendants argued at trial, and argue again on these motions, that they could detain plaintiff at least until he made bail. But defendant Murphy is in no position to assert that argument in this case because he clearly and unambiguously testified that he had determined not to hold plaintiff until he made bail if only plaintiff would sign the release. Thus, even if plaintiff had exercised his right to make bail, since he also refused to sign the release at that time, he would have remained in custody until the bail commissioner arrived. In these circumstances, plaintiff's not having exercised his right to make bail was not a cause in fact of the detention during the substantial period after the release was

first presented to plaintiff and the time when he eventually signed it. That detention occurred because plaintiff refused to sign the release when it was first presented to him, and that detention would have occurred even if plaintiff had also told Murphy he wished to make bail. Thus, the dispute over whether Murphy did or did not advise plaintiff of his right to make bail is not a dispute over a material fact.

The other police officer defendants were found by the jury (with ample support in evidence) to have acted jointly with defendant Murphy in confining plaintiff during this period after the release was presented to plaintiff and before plaintiff signed. By reason of this finding, they occupy the same position as Murphy in being barred from now asserting that they held plaintiff because he had not made bail rather than holding him because for that period of time he was refusing to sign the release.

The closest issue before me is whether the police officer defendants other than Murphy should be held to have been in a different position from Murphy with respect to their contention that the court should hold that they had an objectively reasonable basis for believing that they were not violating plaintiff's clearly established constitutional rights not to be held under arrest without probable cause after they had learned that the assumed facts on which they based their belief of probable cause to arrest plaintiff were incorrect. This issue may be seen as one depending in part upon the precise meaning of the standard of judgment developed in *Harlow* and *Davis*, their progeny in First Circuit decisions, and the recent decision in *Mitchell v. Forsyth*, —— U.S. ——, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), handed down after the verdict in this case.

One question to be considered is by what method the court is to decide whether the claimed constitutional right is "clearly established." Is this question to be decided as courts decide issues of law? Or is it to be decided as courts decide issues of fact (which "fact issues" courts decide "as a matter of law" only if reasonable factfind-

ers could not differ on the evidence before the court)? If it is to be decided as courts decide issues of law, then it is irrelevant that there were disputes of fact as to whether and to what extent each of the other police officer defendants participated jointly with Murphy in presenting the release form to plaintiff and in detaining plaintiff after he first refused to sign and until he eventually did sign. These factual disputes were submitted to the jury in Interrogatory 5, and the jury found against defendants. Thus, the jury has determined that even though these defendants may have contended that the evidence would have supported a different finding, the truth is that each of them was aware the release form was being used with his name among those of the officers to be released, each of them thus at least acquiesced in having his name placed in the release form that defendant Murphy presented to plaintiff, and each of them acted jointly with Murphy in causing plaintiff to be held under arrest during the period from the time the release form was first presented to plaintiff until plaintiff eventually signed it.

Insofar as the question whether a constitutional right is "clearly established" depends on interpreting Supreme Court and Court of Appeals decisions, I conclude that the issue of interpretation is one of law for the court, not one of fact to be submitted to the jury even if reasonable persons could differ about the interpretation of court decisions and whether they had "clearly established" a constitutional right. To hold otherwise would be to create an issue for the jury on which they would plainly need the aid of expert testimony. I conclude that it is not a permissible interpretation of *Harlow, Davis*, their progeny in First Circuit decisions, and the recent decision of the Supreme Court in *Mitchell v. Forsyth*, that this issue should be determined by presenting conflicting expert testimony and asking the jury to decide whether an interpretation relevant to the case at hand was "clearly established." *See especially Mitchell v. Forsyth*, 105 S.Ct. at 2816–17, and *Floyd v. Farrell*, at 6

("The district court erred when it stated 'the issue of qualified immunity is almost universally one which presents a question of fact to be determined by the trier of fact.' ... As here, the availability of the defense will often turn upon questions which can be resolved as a matter of law.") *See also Ricci, supra,* 768 F.2d 456, at 467 (examining nationwide precedent where no previous Circuit decision was in point). I therefore conclude that issues of interpretation of disputed passages in Supreme Court and Court of Appeals decisions are not to be submitted to the jury. They must be decided by the court as issues of law are decided—by receiving and considering arguments of counsel and ruling upon them. "Factual disputes will result in denial of summary judgment" and in submission of the case to the jury "when they are relevant to the qualified immunity defense...." *Floyd,* at 6. But disputes about the interpretation of Supreme Court and Circuit decisions are not "factual disputes." They are disputes about the law.

Given this conclusion, I conclude also that the need in this case for submitting to the jury factual disputes about whether and to what extent other police officer defendants participated jointly with Murphy in holding plaintiff under arrest does not defeat plaintiff's claim that the constitutionally protected liberty interests they violated were "clearly established constitutional rights." It was not in doubt, and no reasonable police officer could have believed otherwise, that continuing to hold plaintiff without a present belief in probable cause for doing so was a violation of plaintiff's constitutional rights.

Insofar as defendants contend that the issue of good faith immunity should have been submitted to the jury, it is to be noted that, though invited to do so, they did not submit a proposed interrogatory to the jury or proposed instructions that would have identified for the court (and for the jury, if the requests were allowed) what was the question of fact the jury was to decide. Even now, in their post-trial submissions, defendants have failed to formulate any submission to the jury that the court could

now examine to determine what issue of fact—rather than law—they would wish the court to submit to the jury.

Nor can the individual defendants (including all others as well as Murphy) succeed in their claim that they are entitled to "good faith immunity" on the theory that a reasonable person in their position could have believed that the release form signed by plaintiff was valid. In the first place, as noted above, the relevant issue of constitutional right is not validity of the release but the plaintiff's liberty interest in not being held in continued police custody without probable cause. In the second place, even if the defendants' statement of the issues were accepted, their contention would still fail because it has long been a clearly established constitutional rule that even when a state has the power to deny a privilege altogether, "it may not impose conditions which require the relinquishment of constitutional rights." *Frost & Frost Trucking Co. v. Railroad Commission,* 271 U.S. 583, 594, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926), *cited in Blackburn v. Snow,* 771 F.2d 556, 568, (1st Cir.1985). Here, the use of the release form was an effort to impose upon plaintiff's assertion of his liberty interest in prompt discharge from custody—an interest protected by the Fourth (and Fourteenth) Amendment—the condition that he sign away his claims for damages for false imprisonment and battery, his claims under 42 U.S.C. § 1983, and his First (and Fourteenth) Amendment rights to redress of grievances.

Defendants' reliance upon substantive due process cases, including *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), and its progeny, is in point only insofar as plaintiffs' § 1983 claims are based on a substantive due process theory.

In this case, the § 1983 claim for holding plaintiff Bancroft Dudley Hall under arrest during the period after the release form was first presented to him and until he finally signed it was plainly a claim for violation of his liberty interest protected by

the Fourth Amendment (through incorporation into the Fourteenth), and it is therefore unnecessary to consider whether his claim could be supported as well on Fifth (and Fourteenth) Amendment substantive due process grounds. For this reason, the rulings in this case as to Bancroft Dudley Hall's claims were entirely consistent with this court's previous decision in *Schiller v. Strangis,* 540 F.Supp. 605 (D.Mass.1982), despite defendants' contentions to the contrary.

In summary, the purported release that defendants placed before plaintiff was not signed by plaintiff until after the plaintiff's liberty interests protected by the Fourth (and by incorporation, the Fourteenth) Amendment had already been violated. The critical issue is not whether, when the defendants acted, they could have reasonably believed that such a release, if signed, would be effective to relieve them of liability for the wrong they had done. Rather the issue is whether they could have reasonably believed that they could continue to hold a person under arrest until he signed the release, when they had already determined that they would not hold him unless he refused to sign.

I conclude that in the circumstances of this detention, even as related by defendants and without giving credit to any evidence of plaintiffs that would have supported findings of even more egregious violations of established rights, no reasonable person in the position of any of the defendants could have failed to understand that he was violating clearly established constitutional rights in continuing to hold plaintiff Hall in custody for the substantial period of time after the officers had determined that they would let him go if he signed and would detain him longer if he declined to sign.

I conclude, as well, that the invalidity of the release on constitutional grounds was clearly established, though in my view this conclusion is not essential to the result reached here.

IV.

The § 1983 claim of plaintiff Sandra Hall against defendant Judge for striking her with force when he and defendant Ochs were removing her father from the car does rest on substantive due process grounds and therefore presents an issue as to whether the substantive due process standard is satisfied in this case. I conclude, however, that the evidence is sharply in conflict as to what happened and the jury verdict clearly indicates that the jury credited plaintiffs' version and discredited defendants' version of what occurred in fact. Defendant Judge's argument that a verdict should have been directed for him on this § 1983 claim is without merit. The evidence was sufficient to support the jury verdict, and that verdict, interpreted in accordance with the instructions given in the charge, meets the substantive due process requirements as developed in such cases as *Johnson v. Glick,* 481 F.2d 1028, 1032–33 (2d Cir.1973). Also, the constitutional right at issue was clearly established long before the incidents in this case. The disputes of fact as to the applicability of that right in this case do not support defendant Judge's claim of good faith immunity. *See Blackburn,* at 570.

V.

Defendant Town of Milton challenges the determination that defendant police officers were acting pursuant to established Town policy in presenting the release form to plaintiff for signature and continuing to detain him from the time he refused to sign until he finally did sign. This contention must be overruled.

The evidence is undisputed that the form used was a printed form, with the Town's seal on it, prepared by Town officials and available for use of police officers for many years before this incident. The police officers, in presenting the form to Hall and holding him when he declined to sign, were acting in accordance with a practice so long in use by the police officers of the Town that the inference was compelled that this police practice was known to and approved

by Town officials responsible for establishing policies and practices of the police force.

## VI.

Defendants' appear to contend that the court made a "ruling that there was false imprisonment as a matter of law" *before* defendant Murphy presented the release to plaintiff, and that the court "ruled that Hall was falsely imprisoned and illegally detained from the time when the officers had no basis for holding him—i.e. when he identified himself [T. 4/78–82]," Defendants' Memorandum at 38. This contention is at least misleading if not plainly based on a false assumption as to the court's ruling. There was conflicting evidence as to when plaintiff *first* identified himself, though no dispute that he did give full identifying information at some time before the release form was first presented to him. In the colloquy referred to, the court was conferring with counsel, out of the presence of the jury, about the scope of one, but only one, of the grounds of probable cause for arrest asserted by defendants—that he had refused to identify himself when the officers first approached him and thus had violated a state statute. No occasion for a ruling on the point was presented at that time, though of course it was necessary for the court to rule on this issue in the charge to the jury. *See* Tr. 8/92–93. Neither in the colloquy referred to nor in the charge to the jury did the court ever hold that plaintiff was, as a matter of law, falsely imprisoned from the moment he identified himself until he was released. Rather, the ruling was that he was falsely imprisoned from the moment defendant Murphy told him he was free to go if he would sign the release form but would be held longer if he refused.

## VII.

Defendants contend that the amounts of the damages findings are excessive and lack support in the evidence. This contention, also, must be rejected.

Defendants contend that Question 9 of the Verdict form "was allegedly based on a mixture of state law claims for false imprisonment and upon section 1983," Defendants' Memorandum at 56. This contention reflects a misunderstanding of the reason for submitting Question 9 to the jury. It was submitted only for the purpose of determining what amount of interest, if any, the jury would award on sums awarded under the § 1983 claim. The jury finding in Question 9 is relevant only to § 1983 liability. It cannot limit the amount due under state law.

Under Massachusetts law, prejudgment interest on compensation awarded for the false imprisonment claim is added by the Clerk, as a matter of law, in determining the amount of the judgment. Since the amount of prejudgment interest allowed by the jury in their answer to Question 9 was less than the amount due under state law, judgment against all defendants liable under state law was awarded for the larger amount required by state law rather than merely the smaller amount found by the jury. Had the jury awarded prejudgment interest for the § 1983 claim in excess of that due under state law for the false imprisonment claim, plaintiffs would have had a claim (the merits of which I need not determine in this case) for the larger interest figure found by the jury. Of course, plaintiffs were entitled to have the judgment make clear that they had two grounds for recovery of that portion of the larger state law mandated prejudgment interest award that was also within the § 1983 prejudgment interest amount found by the jury.

## VIII.

As defendants have noted, the total amount of all awards in the judgment was $525,696.02. In examining whether it was supportable, however, the court must consider the separate elements as well as the total. The total amount consisted of the following types of awards, in the amounts indicated.

| Compensatory damages to Sandra Hall | $ 5,000.00 |
|---|---|
| Compensatory damages to Bancroft Dudley Hall | 160,000.00 |
| | |
| Punitive damages | |
| Against Defendant Ochs | 80,000.00 |
| Against Defendant Judge | 60,000.00 |
| Against Defendant Murphy | 60,000.00 |
| Against Defendant Rogers | 10,000.00 |
| | |
| Prejudgment interest | 86,883.89 |
| Attorney fees | 61,623.75 |
| Expenses | 2,188.38 |
| | $525,696.02 |

The total prejudgment interest due was fixed by state law and calculated by the Clerk of this court in accordance with the practice mandated by state law applicable to the state law claims for battery and false imprisonment. As noted in Part VII above, the jury finding of prejudgment interest of $60,000 as the compensatory damages recoverable under the § 1983 claims was less than the interest mandated by state law at a rate of 12 percent per annum. Thus, it added nothing to the total interest awarded, though it did add an additional ground for sustaining part of the interest award. In these circumstances, the interest award cannot be determined to be excessive unless the total of compensatory damages on which it was calculated was excessive.

The total of compensatory damages awarded was $5,000 to Sandra Hall and $160,000 to Bancroft Dudley Hall.

The total of punitive damages was $210,000. The most awarded against a single defendant, in compensatory and punitive damages combined, was $240,000 against defendant Ochs.

## IX.

In considering the contention that the amounts awarded were excessive, the court must view the evidence from the perspective of the most favorable inferences to the plaintiffs that the evidence will support. Disputed facts and inferences may have been resolved by the jury favorably to plaintiffs. The disputes were stark.

The evidence supported findings that both plaintiffs sustained unprivileged phys-ical contacts intentionally inflicted by defendants. It is true, as defendants argue, that neither plaintiff suffered any lasting physical effects. In determining reasonable compensation for intentionally inflicted physical contacts (battery) and false imprisonment, however, a jury is permitted to take account of the demeaning and insulting qualities of both the actions of the defendants and their consequences to plaintiffs.

In considering what punitive damages are appropriate, a jury may also consider the acts and demeanor of the defendants throughout the trial as bearing on whether there is a need for punishment of the defendants and deterrence of like conduct by them or others who may be in similar circumstances in the future.

Defendants chose a hard-line strategy of trial, giving testimony that, at least implicitly if not explicitly, charged plaintiffs with lying both before trial and on the witness stand during trial. Also, defense counsel explicitly argued to the jury that plaintiffs' testimony was deliberately false. The jury verdict plainly rejected defendants' testimony and argument in these respects.

The evidence offered by defendants included a police report prepared promptly after the incident and testimony at trial of different defendants, relating separately in almost identical phrasing, that Bancroft Dudley Hall, a Black, made to the police officers a statement that any factfinder would consider demeaning and insulting toward less educated, less successful, and less fortunate Blacks. The jury, observing the demeanor, manner, and speech of the parties throughout the trial, had the responsibility of determining the truth or falsehood of this testimony of defendants and the plaintiff Bancroft Dudley Hall's denial. On this evidence, a factfinder might infer that the stark clash could not have resulted from innocent misrecollection, and that its intentional quality intensified any need the jury may have found for punishment and deterrence. Credibility was, of course, for the jury to determine. It may well be that this testimony was meant to and did have shocking impact.

**378**

Throughout the nine-day trial of this case, the demeanor of the jury was exemplary. They were attentive and punctual. The information about them obtained during voir dire examination supported the view that they were an exceptional group from the point of view of traditional measures of ability and success in their personal and occupational experience. Taking account of the characteristics of the jury as well as the details of the verdict and the evidence before the jury, I conclude that it was a considered, thoughtful verdict of a unanimous jury.

 The findings of compensatory damages were supported by evidence, and the punitive awards were an expression of the conscience of the community. The verdict must stand.