Bancroft Dudley HALL, et al.,
Plaintiffs, Appellees,

v.

Frederick J. OCHS, et al.,
Defendants, Appellees.

Frederick J. Ochs, S. Leo Judge, James P. Rogers, Thomas F. Murphy and Town of Milton, Defendants, Appellants.

No. 85–1993.

United States Court of Appeals,
First Circuit.

Argued Nov. 4, 1986.

Decided May 5, 1987.

As Amended May 26, 1987.

Philip M. Cronin with whom Michael P. Duffy, Withington, Cross, Park & Groden, Boston, Mass., and Robert D. O'Leary, Town Counsel, Milton, Mass., were on brief, for defendants, appellants.

Richard P. Ward with whom Eleanor D. Acheson and Ropes & Gray, Boston, Mass., were on supplemental brief, for defendant, appellant Thomas F. Murphy.

Michael Avery with whom Avery & Friedman and John Reinstein, Civil Liberties Union of Massachusetts, Boston, Mass., were on brief, for plaintiffs, appellees Bancroft Dudley Hall, et al.

Verne W. Vance, Jr., Foley, Hoag & Eliot and Robert P. Sherman, Boston, Mass., on brief for Lawyers' Committee, for Civil Rights Under Law of the Boston Bar Ass'n, amicus curiae.

Before CAMPBELL, Chief Judge, TORRUELLA, Circuit Judge, and PIERAS,* District Judge.

TORRUELLA, Circuit Judge.

This is an appeal from a jury verdict entered in a civil rights and pendent state tort suit brought by plaintiffs Bancroft Dudley Hall and Sandra Hall against four Milton police officers and the Town of Milton. The alleged errors we examine on appeal relate to a directed verdict against the Town and one of the officers, the denial of qualified immunity, a jury instruction on joint liability, and the damage and attorneys' fees awards. We affirm in large part the decision of the trial court. We reverse, however, the district court's application of a multiplier to the attorneys' fees award.

I. *Background*

At trial the parties presented sharply conflicting versions of the events that led plaintiffs Sandra and Bancroft Hall to file their complaint. While the jury apparently credited the Halls' version and not the police officers', we will begin with only the uncontested facts because one of the important issues on appeal is the appropriateness of a directed verdict for plaintiffs.

On Sunday morning, October 26, 1980, Bancroft Hall arrived at the Sullivans' home at 167 Dudley Lane in Milton, a nearly all white suburb just south of Boston. Hall, who is black, was driving a 1972 Pinto described as "out of place" in the neighborhood by defendants' witness. Hall went to the Sullivans' front door, where he was met by his daughter, Sandra, and her friend Maura Sullivan. Sandra had stayed the night with Maura after a track meet where the two girls competed for their school. Sandra was not ready to go, so he returned to the car to wait and to read the Sunday paper.

Meanwhile, the daughter of a neighbor drove by the house, saw the car and Mr. Hall, and noticed that a ladder which had been outside the house was now gone. After she told this to her mother, her mother called the Sullivans' house and received no answer. The neighbor then called the Milton police to report a suspicious man parked in an old car in the Sullivans' driveway.

The police dispatcher sent out a call that there was a suspicious car at 167 Dudley Lane with a black male behind the wheel

and a possible breaking and entering in progress. Milton Police Officer Frederick Ochs (who, like the other individual appellants, is white) arrived first at the Sullivans and parked his cruiser immediately behind the Halls' Pinto, blocking the driveway. The time was 11:30 a.m. Officer Ochs got out of his car, drew his revolver, walked to the driver's side of the Pinto, pointed the gun at Hall and asked for Hall's driver's license and registration. Hall protested that he had done nothing wrong and asked why Ochs wanted to see his license.

Meanwhile Officer Judge arrived. A short time later, after an interchange described very differently by the respective parties, Officer Judge pushed Sandra, who was by this time in the car holding onto her father, out of the way, and the two officers forcibly removed Hall from the car. At some point during this time the police obtained Hall's license. They put Hall on the ground, rolled him over and handcuffed him.

The officers then drove Hall to the Milton Police Station, where he was informed he had been arrested for failure to produce his license when requested and for disorderly conduct, both misdemeanors under Massachusetts law. Booking officer James Rogers read Hall his rights, including his right to a bail hearing. Shortly after that, Lieutenant Thomas Murphy, the commanding officer at the station, arrived in the booking area and read Hall his rights again. Murphy then announced that, if Hall would sign a waiver giving up his right to sue the police officers, the charges would be dropped and he could leave. The waiver was on a preprinted form with the Town seal and had been in sporadic use for about 30 years. Hall refused to sign the waiver and Murphy instructed Rogers to book him and place him in a cell.

During the course of the next hour, Murphy asked Hall to sign the waiver two more times, Sandra pleaded with him to sign the waiver, and Dr. Sullivan, who had come to the station when he learned what happened, suggested that Hall sign the waiver. Finally, Hall called a lawyer who had helped him with some real estate transactions. The lawyer recommended that he get out of there as fast as he could. Hall signed the waiver and left the station at 1:30 p.m.

## II. *Proceedings Below*

Bancroft and Sandra Hall filed a complaint on February 6, 1981 charging appellants and three other officers (who were later dismissed) with federal civil rights violations, assault and battery, false arrest, and false imprisonment. They added a state civil rights count by amendment on April 22, 1981. Trial began on April 11, 1985. At the conclusion of all the evidence the trial judge directed a verdict for plaintiff Bancroft Hall against defendants Murphy and the Town on the false imprisonment and associated civil rights counts. The judge refused to charge that defendants were entitled to qualified immunity for their actions under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The jury then returned a verdict for plaintiffs on nearly all the counts. The jury found that Judge committed a battery on Sandra Hall, that Ochs and Judge together falsely arrested and committed a battery on Bancroft Hall, and that Ochs, Judge and Rogers acted jointly with Murphy in falsely imprisoning Bancroft Hall. Because the officers acted under color of law these findings support § 1983 judgments as well. The jury awarded Bancroft Hall $160,000 in compensatory and $200,000 in punitive damages. They awarded Sandra Hall $5,000 in compensatory and $10,000 in punitive damages.

The jury also granted Bancroft Hall $60,000 in prejudgment interest. The trial judge increased this prejudgment interest award to conform to that required by Massachusetts law for the damages awarded for the state tort violations (*i.e.*, everything except the award against the Town and the punitive damages). The trial judge then awarded plaintiffs attorneys' fees using the lodestar approach required in this circuit. *See Grendels Den v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984). He set the attorneys' fees at the rate of $175 an hour

for lead counsel, Michael Avery, and $125 an hour for assistant counsel John Reinstein, plus a 50% multiplier for both attorneys based on their "exceptional success" and a contingency factor. The fees awarded came to approximately $60,000.

Defendants appeal on a variety of grounds. They challenge the directed verdict as contrary to the evidence, and the qualified immunity decision as based on a mistaken understanding of the law. They point to a jury instruction on the joint liability of the defendants that is contrary to state law. And they contest both the damages and the attorneys' fees awards. We will examine each of these issues in turn.

### III. *The Directed Verdict*

The directed verdict covered Hall's confinement at the station after he refused to sign the waiver form. The judge directed the verdict against Murphy, because he offered Hall the release and then confined Hall, and against the Town, because Murphy was acting pursuant to Town policy. Defendants challenge this ruling as contrary to the facts as seen in the light most favorable to them.

■■ Murphy claims that he thought Hall was properly arrested and that offering the release was the act of a "Good Samaritan." Regardless of Murphy's intentions, however, he offered Hall a clear choice: either (1) stay in jail and go to court tomorrow, or (2) request bail, stay in jail until the Bail Commissioner comes (which the trial judge found would take substantial time on a Sunday afternoon) [1] then go to court tomorrow, or (3) sign a release waiving the right to sue and leave now, with the charges dropped. Reduced to its essence the choice was this: forfeit your liberty and face criminal charges or forfeit your right to bring suit. Confronted with this choice, Hall chose to keep his right to seek civil redress, so he remained imprisoned, until he broke down and signed the waiver.

The granting of a directed verdict for plaintiff is a chancy affair. However, where appropriate it should be granted. Based on the above uncontested facts the directed verdict was proper. Hall clearly had a fourth amendment right to be free from unreasonable seizures of his person. *See, e.g., Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). And just as clearly he had a first amendment right to access to the courts to vindicate his rights secured under state and federal law. *See, e.g., In re Primus,* 436 U.S. 412, 422–23, 98 S.Ct. 1893, 1899–1900, 56 L.Ed.2d 417 (1978); *see also Johnson v. Avery,* 393 U.S. 483, 498 and n. 24, 89 S.Ct. 747, 755 and n. 24, 21 L.Ed.2d 718 (1968) (Douglas, J., concurring) (discussing right of "reasonable access to the courts"). Confining Hall because he wanted to exercise his right to seek civil redress violated his right to liberty.

While individual rights may be waived, such waivers must be *voluntary. See Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). In the circumstances of this case, no reasonable person could describe Hall's "waiver" as voluntary. He was coerced, pure and simple, by the threat of continued incarceration.

The Supreme Court recently rejected the proposition that the exchange of a covenant not to sue in return for dropping criminal charges is *per se* unenforceable; but the Court clearly stated that *such an exchange must be voluntary. See Town of Newton v. Rumery,* —— U.S. ——, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). The Court noted that the plaintiff in that case, Rumery, "was not in jail and was represented by an experienced criminal lawyer, who drafted the agreement," and furthermore, "Rumery considered the agreement for three days before signing it." *Id.* —— U.S. at ——, 107 S.Ct. at 1192–94. Bancroft Hall's situation was far more coercive. He was in jail after seeing that the raw power of the police department could humiliate him in front of his daughter and forcibly remove him from premises he was

---

1. Furthermore, Murphy admitted that he had not explained the bail procedure to Hall, who had never been arrested before and who could

not be expected to have any idea how long it would take or what his bail would be.

lawfully on. And, until he signed a waiver, that power would keep him in jail, as he learned after his first, second and third refusals to sign.

Had Rumery been prosecuted for refusing to sign, he could have defended himself using all the protections due process provides. But Hall had no defense to his incarceration. Not surprisingly, after three refusals and well over an hour in jail, his resolve buckled. No waiver executed under such circumstances can be called voluntary.

Holding Hall under these circumstances violated his fourth amendment right to freedom from unreasonable seizures of his person. *See, e.g., Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960). Although we must assume, for purposes of the directed verdict, that there existed probable cause for the arrest and detention, Murphy testified that he had made up his mind to let Hall go if he signed the waiver. Accordingly, Hall was not being held to insure his appearance in court, or for any other reason related to the prosecution of the misdemeanors with which he was charged. Rather, Murphy held him for the sole purpose of gaining absolution for the prior violations. "[G]overnment may not condition access to even a gratuitous benefit ... upon the sacrifice of a constitutional right." *Blackburn v. Snow,* 771 F.2d 556, 568 (1st Cir. 1985). Conditioning Hall's freedom on the waiver of his first amendment right deprived him of his right to liberty. *Cf. Brewer v. Blackwell,* 692 F.2d 387, 399 (5th Cir.1982) (noting that presenting the choice between signing "such a worthless document" and staying in custody is a deprivation of the "right to liberty").

■ As a second defense, the Town claims that the *jury* should have been allowed to determine whether Murphy was acting pursuant to Town policy (if he was, of course, the Town would be liable). Nevertheless, the Town does not dispute that the release was on a preprinted form carrying the Town of Milton Seal. The Town, through the Chief of Police, admit-ted that the form had been in use since the 1950's, at least, and that the Town had obtained legal advice regarding that use. Furthermore, Murphy testified that he thought he was acting according to Town policy. There was absolutely no evidence presented at trial suggesting that the release was anything other than Town policy. In fact, the Town steadfastly maintained throughout the trial that the release was a valid defense to all the claims against it. Plaintiffs need not, as the Town contends, produce a resolution of the Board of Selectman, or similar official act, adopting the release. The directed verdict was proper.

## IV. Qualified Immunity

■ We have had abundant opportunity recently to apply the law of qualified immunity in the context of political discharge cases. *See, e.g., De Abadia v. Izquierdo Mora,* 792 F.2d 1187 (1st Cir.1986). What we have said there is directly applicable to this case. Applying the test enunciated in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), we wrote:

> In sum, we are presently concerned not with the correctness of defendants' determination, on the one hand, nor their subjective state of mind, but of the "objective reasonableness" of their conduct.... *Harlow* demands not prescience, but objective good faith.

*De Abadia,* 792 F.2d at 1193. Despite appellants' protestations to the contrary, the objective reasonableness determination is for the judge to make, and not for the jury. *See id.* Since a reasonable public official, particularly a police officer, is expected to know the law, our inquiry is nothing more than an examination whether the events of October 26, 1980, violated "clearly established ... constitutional rights." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738.

### A. The Imprisonment

With regard to the imprisonment, our task is to decide whether it was clearly established in October, 1980, that holding Bancroft Hall in custody solely because he refused to promise not to sue his captors violated his rights. In making this deter-

mination, we need not find a ruling that considered the precise situation at hand. It is enough, rather, that there existed case law sufficient to clearly establish that, if a court *were* presented with such a situation, the court would find that plaintiffs' rights were violated. *See King v. Higgins,* 702 F.2d 18, 20 (1st Cir.1983). We find that the law was sufficiently established to put a reasonable police officer on notice that what he was doing violated Hall's right to be free from unreasonable seizure.[2]

Several decisions of the Supreme Court had treated access to court to redress civil wrongs as a First Amendment right. *See In re Primus,* 436 U.S. 412, 422–32, 98 S.Ct. 1893, 1899–1904, 56 L.Ed.2d 417 (1978); *United Mine Workers of America v. Illinois State Bar Ass'n,* 389 U.S. 217, 223, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *cf. Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1968) (protecting right to access to court on due process and equal protection grounds). And it was well established that a waiver of a constitutional right must not be coerced. *See Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). It was no less self evident in 1980 than it is today that holding someone in jail until he waived the right to sue was coercive.

■ The right to be free from unreasonable seizures of the person was similarly well established by 1980, *see, e.g., Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1960),[3] as was the principle that the government may not impose unconstitutional conditions on the granting of a bene-

fit. *See, e.g., Frost v. Railroad Commission,* 271 U.S. 583, 46 S.Ct. 605, 70 L.Ed. 1101 (1925). The fact that no court had put these pieces together in the precise manner we do today does not absolve defendants of liability. No police officer reasonably aware of the law could have failed to appreciate that confining Bancroft Hall until he agreed to forfeit the right to sue violated his civil rights.

## B. The arrest and battery

■ Defendants Ochs and Judge claim that their qualified immunity should have been submitted to the jury as well. Both claim that, because they are entitled to immunity for the arrest as long as the probable cause was "at least arguable," *see Floyd v. Farrell,* 765 F.2d 1, 5 (1st Cir. 1985), the issue of whether probable cause was "at least arguable" should have gone to the jury. They are mistaken.

The question of qualified immunity presented no separate fact finding for the jury. The plaintiffs and the defendants presented sharply conflicting versions of the events at 167 Dudley Lane. If plaintiffs were right, then there was no shred of probable cause. And if defendants were right, then there was probable cause. The jury believed plaintiffs and not defendants. The officers had no qualified immunity to act as the jury found they acted.

Defendants also claim that the issue of qualified immunity for excessive force used against plaintiffs presented a question of fact for the jury. While there are circumstances in which reasonable police officers, and, indeed, reasonable courts may differ as to whether the force used was excessive, this case presented no such circumstances.

---

**2.** In arguing for qualified immunity, defendants *point to three decisions issued by the Massachusetts Supreme Judicial Court that upheld, under Massachusetts law, the validity of the same type of waivers at issue in the instant case. Without passing on the relevance of state law on the availability of qualified immunity, we note that the Massachusetts decisions do not support defendants' position. In *Wax v. McGrath,* 255 Mass. 340, 151 N.E. 317 (1926), the Supreme Judicial Court made clear that such waivers were valid only insofar as voluntarily given. "It was for the jury to determine whether the plain-

tiff voluntarily executed and delivered the release, or whether he was induced to act in the belief pressed upon him and reiterated by the officer, that *unless he signed he could not regain his freedom.*" *Id.* at 345, 151 N.E. at 319 (emphasis added).

**3.** *Cf. Blackburn v. Snow,* 556 F.2d at 569 ("[i]t hardly can be debated that [plaintiff] had, in 1977, a 'clearly established' Fourth Amendment right to be free of unreasonable searches").

Once again, the parties presented dramatically opposed testimony. If the jury believed the officers, plaintiffs would not recover. But if the jury believed the plaintiffs, the force used was clearly excessive, and the officers would have had no qualified immunity. Accordingly, the trial judge was proper in denying defendants' motion for qualified immunity.

## V. *The Jury Instruction on Joint Liability for False Imprisonment*

■ With reference to joint liability for the arrest and imprisonment of Bancroft Hall, the trial judge instructed the jury that "when the defendants act together, the law permits the injured party to treat all concerned in the injury jointly; and all are liable to the plaintiff in a total sum as damages." While this instruction is a correct statement of joint liability under § 1983, *see* Prosser and Keeton, *Law of Torts*, § 46 (5th ed. 1984), it mistates the law for the state law charges. By statute Massachusetts has limited joint liability of police officers as follows:

> No action, except for use of excessive force, shall lie against any officer other than the arresting officer, by reason of the fact that, in good faith and in the performance of his duties, he participates in the arrest or imprisonment of any person believed to be guilty of a crime *unless it can be shown that such other officer* in the performance of his duties *took an active part in the arrest or imprisonment* as aforesaid, either by ordering or directing that said arrest or imprisonment take place or be made, or by actually initiating the making and carrying out of said arrest and imprisonment.

Mass.Gen.L. ch. 263 § 3 (emphasis supplied). This error is largely harmless, however, (and may, in fact, have been wisely committed to avoid confusing the jury), although it will result in a small reduction of the judgment against defendants Rogers and Judge.

As a practical matter, the error affects only the prejudgment interest portion of the judgment, because the state tort and § 1983 claims were completely overlapping; the acts causing the harm were both civil rights violations and torts under Massachusetts law. State law mandates a 12% prejudgment interest rate, while under § 1983 plaintiffs get only the interest the jury awards. In this case the jury awarded less than 12% prejudgment interest. Thus, defendants prejudiced by the joint liability mistatement need only pay interest at the rate awarded by the jury.

Taking the defendants in turn, we find that the error is harmless as to Murphy, because his actions gave him such an "active part in the arrest or imprisonment" that the trial judge directed a verdict against him. And Ochs was the arresting officer, therefore he was not protected by the statute.

Judge and Rogers, on the other hand, present a less clear case. While the facts certainly would support a finding that Judge took an "active part in the arrest ... by actually initiating the making and carrying out of said arrest," the jury was not asked to make such a finding. Judge testified that Officer Ochs made the arrest and only then asked for assistance in removing Hall from the car. Taking this testimony in the light most favorable to defendant Judge, we cannot say that he "took an active part in the arrest" as meant by Mass.Gen.L. ch. 263 § 3. The evidence supporting Rogers' "active part" is even less clear, given his testimony that he acted at Lieutenant Murphy's direction. Accordingly, we vacate the finding that defendant Judge and defendant Rogers were jointly liable for the arrest or imprisonment of Bancroft Hall under state law. We repeat, however, that they are jointly liable under federal law and that our ruling will affect only the prejudgment interest portion of the monetary judgment against them.[4]

---

**4.** In theory, Judge and Rogers are only entitled to a new trial on the state law arrest and imprisonment claims rather than reversal of these counts. Technically our judgment is a remit-titur of the excess interest subject to plaintiff's right to insist upon a new trial in which, conceivably, he might demonstrate Judge's and Rogers' liability under state law. *See Kolb v.*

## VI. *Damages*

██ We recently considered a similar claim for excessive damages. *See Brown v. Freedman Baking Co., Inc.*, 810 F.2d 6 (1st Cir.1987). In that case we wrote:

> We rarely will override the jury's judgment on the appropriate amount of damages to be awarded. "[T]he jury's otherwise supportable verdict stands unless [it is] 'grossly excessive' or 'shocking to the conscience.'" We accord broad discretion to the trial court's decision to affirm the jury's award of damages because of that court's greater familiarity with local community standards and with the witnesses' demeanor at the trial.

*Id.* 810 F.2d at 11 (citations omitted). Applying the same deferential standard to this case, we affirm the decision below.

### A. *The Compensatory Damages Awarded to Bancroft Hall*

The jury awarded compensatory damages to Hall as follows:

1. For battery, against Ochs and Judge: $25,000.
2. For false arrest and imprisonment prior to the presentation of the waiver form, against Ochs and Judge: $10,000.
3. For false imprisonment after presentation of the waiver form, against all defendants: $25,000.
4. For emotional distress, against all defendants: $100,000.

Defendants claim that there is no rational relationship between the claimed injuries and the damage verdict. We disagree.

While Hall suffered only minor physical injuries, the harm to his mental and emotional well being was substantial. He received counseling from a psychiatric nurse. He had recurring nightmares and a continuing fear of police. And most importantly, the memory of this experience, in which the color of his skin triggered a chain of events that left him handcuffed, face down on the ground, will remain with him. The knowledge that such an incident of racial discrimination could happen to him in the 1980's, while sitting in his car reading the paper and waiting for his daughter, has to have had a profound and lasting effect on Bancroft Hall. So the jury found. In light of the testimony at trial we have no quarrel with the compensation awarded.

### B. *The Punitive Damages Awarded to Bancroft Hall*

The jury awarded punitive damages to Hall as follows:

1. Against Ochs: $80,000
2. Against Judge: $50,000
3. Against Murphy: $60,000
4. Against Rogers: $10,000.

Defendants claim these awards are excessive.

As we stated in *Freedman Baking Co.* "[p]unitive damages are an appropriate means of punishing [racially discriminatory] conduct and deterring defendants from future discriminatory actions." 810 F.2d at 11. In this case Bancroft Hall demonstrated to the jury that he was the victim of shocking and brutal racial discrimination. As the conscience of the community, the jury responded accordingly. Their award is justified not only by defendants' actions on October 26, 1980, but also by their subsequent behavior. The trial judge explained defendants' conduct at trial, and its relevance to the jury award, as follows:

> Defendants chose a hard-line strategy of trial, giving testimony that, at least implicitly if not explicitly, charged plaintiffs with lying both before trial and on the witness stand during trial. Also, defense counsel explicitly argued to the jury that plaintiffs' testimony was deliberately false. The jury verdict plainly

*Goldring, Inc.*, 694 F.2d 869, 875 (1st Cir.1982) (exercising power of appellate court to order remittitur); *Betancourt v. J.C. Penney Co.*, 554 F.2d 1206, 1209 n. 5 (1st Cir.1977) (noting appellate power to order remittitur). In the unlikely event that plaintiff desires a new trial in lieu of accepting a reduction in the interest payable by Judge and Rogers, he may so indicate in a petition for rehearing, in which event we shall consider entering a revised order remanding for a new trial. Our current judgment, however, is to remand for a simple reevaluation of the interest.

rejected defendants' testimony and argument in these respects.

The evidence offered by defendants included a police report prepared promptly after the incident and testimony at trial of different defendants, relating separately in almost identical phrasing, that Bancroft Dudley Hall, a Black, made to the police officers a statement that any factfinder would consider demeaning and insulting toward less educated, less successful, and less fortunate Blacks. The jury, observing the demeanor, manner, and speech of the parties throughout the trial, had the responsibility of determining the truth or falsehood of this testimony of defendants and the plaintiff Bancroft Dudley Hall's denial. On this evidence, a factfinder might infer that the stark clash could not have resulted from innocent misrecollection, and that its *intentional* quality intensified any need the jury may have found for punishment and deterrence.

*Hall v. Ochs,* 623 F.Supp. 367, 377 (emphasis supplied). Defendants have continued to deny on appeal that their actions had anything to do with race, notwithstanding the clear import of the jury verdict.

## C. The Damages Awarded to Sandra Hall

The jury awarded Sandra Hall $5,000 in compensatory and $10,000 in punitive damages, assessed against defendant Judge. This relatively small award comports with the substantially lesser harm done to Sandra, as compared to her father, and illustrates the care the jury used to apportion the damages justly. Judge's claim that the award is excessive is frivolous. The jury found that an armed police officer struck a teenaged girl in the face in order to drag her father from his car in the course of an unjustified arrest. The trauma she suffered from that event was considerable. And Officer Judge's behavior was suffi-

ciently shocking to justify punitive damages.

## VII. Attorneys' Fees

The trial judge awarded attorneys' fees to lead counsel Michael Avery at the rate of $175 an hour for 186.1 hours and to assistant counsel John Reinstein at the rate of $125 an hour for 75.7 hours. The trial judge then adjusted the fees award of the two attorneys upward by 50% for their pre-verdict work, primarily because of their "exceptional success," but also because of the contingent nature of recovery. Defendants do not challenge the hours claimed, but they do challenge the rates awarded and the multiplier. Defendants cloud the issue, however, by lumping the hourly rate with the upward adjustment to arrive at "hourly rates" of $262.50 for Avery and $187.50 for Reinstein. The appropriate analysis is the two-step lodestar approach used by the district court. *See Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 610 (1st Cir.1985).

## A. The Reasonable Hourly Rate

■ The Supreme Court recently reaffirmed that in civil rights litigation reasonable hourly rates are determined by the "prevailing market rate." *Blum v. Stenson,* 465 U.S. 886, 892–896, 104 S.Ct. 1541, 1545–47, 79 L.Ed.2d 891. Plaintiffs presented an affidavit by an established Boston attorney and the American Lawyer's *Guide to Leading Law Firms,* which support the trial judge's conclusion that $140 to $175 an hour was the prevailing market rate for skilled litigation services. The trial judge was justified in awarding Avery fees at the upper end of that range based on his extensive civil rights litigation experience and accomplishments in the field.[5] We note that Avery appears to be at least as accomplished and experienced in his field as Professor Tribe was in his field at the time of the *Grendel's Den* litigation,

---

**5.** Michael Avery submitted an uncontradicted affidavit stating the following. He has been a civil rights and "police misconduct" specialist for 15 years. He has been involved in hundreds of police conduct cases and has tried dozens of them to juries. He has taught civil rights

courses at Yale Law School and Northeastern University School of Law. He is the coauthor of the leading text on police misconduct litigation, *Police Misconduct: Law & Litigation* (2d ed. 1980), and he has lectured on the subject across the United States.

in which we awarded Professor Tribe $175 an hour. *See Grendel's Den,* 749 F.2d at 955–56.

The rate of $125 an hour for second chair John Reinstein is the same rate we approved for Professor Tribe's second chair, Professor Rosenberg. *See id.* Reinstein is an experienced and accomplished litigator in his own right and has specialized in civil rights for nearly as long as Avery. The district court found that this was a difficult case and that the work of the two attorneys was neither wasteful nor duplicative. We affirm the lodestar rate.

### B. The Upward Adjustment

■ The trial court based its 50% upward adjustment on the "exceptional results" achieved, and to a lesser degree, on the contingent nature of recovery. This adjustment is inconsistent with the recent Supreme Court opinion in *Pennsylvania v. Delaware Valley Citizens' Council,* —— U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). That opinion makes clear that adjustments are not to be given in reward for stellar performance. The court wrote:

> Because considerations concerning the quality of a prevailing counsel's representation normally are reflected in the reasonable hourly rate, the overall performance ordinarily should not be used to adjust the lodestar, thus removing any danger of "double counting."

106 S.Ct. at 3099. We fully accept the district court's finding that counsel performed extraordinarily well. But *Delaware Valley* says that exceptional performance is generally a function of the competence and experience that is reflected in the reasonable hourly rate and is not grounds for an upward adjustment. Here we cannot say that counsel performed disproportionately better than their quite impressive experience would suggest.

*Delaware Valley* leaves open the risk of loss or contingent nature of recovery as a possible ground for an upward adjustment, a ground that we recognized in *Wildman v. Lerner Stores Corp.,* 771 F.2d 605, 612–13 (1st Cir.1985). But there is little basis for invoking that factor here. This case was complex, but the facts were sympathetic to plaintiffs and, in some respects, quite unfavorable to the police. Indeed, we know from the record that the press reported the incident in a light favorable to plaintiffs. To be sure, plaintiffs were fortunate in being represented by competent, intelligent and experienced counsel; there were hurdles; less able counsel might have become enmeshed in legal errors. But the same can be said of many other tort and civil rights cases. This was not, at the outset, a notably discouraging case.

The fact counsel chose to take the case upon the understanding that they would look solely to their right to recover fees under the statute speaks well of counsel, but it is not a strong argument for a multiplier. They chose to make this arrangement. Had they wished to insist on another arrangement they could have done so. The 50% upward multiplier is vacated.

### VIII. Prejudice

Defendants claim that they were deprived of a fair trial due to prejudicial newspaper publicity and the bias of the trial judge. We have carefully reviewed these claims and find them to be without merit.

### Conclusion

In summary, we conclude that the directed verdict was proper, that the defendants were not entitled to qualified immunity, that the damages were not excessive, and that the hourly rate of the attorneys' fees award was adequately supported. The attorneys' fee multiplier, however, was inappropriate. The jury instruction on joint liability was error as respects state law, but that error is harmless except with respect to the prejudgment interest liability of defendants Rogers and Judge. The appellants' remaining arguments lack merit.

Accordingly, *the decision of the trial court is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.* Appellants shall bear the costs of appeal, including reasonable attorneys' fees, but not including those costs fairly attributable to the state law joint liability issue or the upward

adjustment of attorneys' fees. These costs shall be determined on remand.

LEVIN H. CAMPBELL, Chief Judge (concurring).

Although I agree fully with the result the court reaches, I write separately to express my doubts as to its reasoning in conjunction with Lt. Murphy's liability for false imprisonment.

My colleagues would hold that because Lt. Murphy conditioned Hall's release upon his executing an unconstitutional waiver, Hall's continued imprisonment became, then and there and solely for that reason, illegal and "false." In adopting this view, they do not discuss whether, at the time of Hall's continued imprisonment (after he had refused to sign the waiver), the state had probable cause to imprison him. In my judgment, simply because Murphy conditioned Hall's release upon the latter's execution of an unconstitutional waiver did not inevitably cause Hall's continued detention to constitute the tort of false imprisonment. Only if the police then lacked probable cause to hold Hall was that tort committed. *See, e.g., Doggett v. Hooper,* 306 Mass. 129, 133, 27 N.E.2d 737, 740 (1940) ("[t]he confinement of the plaintiff, having been authorized by law, would not furnish the basis for an action for false imprisonment"). My brothers' theory, based exclusively on the illegal waiver, is ingenious, but they can point to no Massachusetts or federal case in support of it.

I prefer the following analysis: I believe the district court initially erred when it directed a verdict against Murphy on the false imprisonment claim, since probable cause had yet to be determined. That error was later rendered harmless, however, by the jury's resolution of the probable cause issue against the police in a related claim.

For Hall to prevail under Massachusetts law on the false imprisonment claim, he needed to prove (1) that he was falsely imprisoned and (2) that Murphy assumed "an active part in the arrest or imprisonment." Mass.Gen.Laws ch. 263, § 3 (1984). Neither below nor on appeal has any party seriously disputed that Murphy was the central figure in the police decision to imprison Hall. By directing a verdict, however, the district court improperly took from the jury the question of whether Hall had been falsely imprisoned, *i.e.,* whether there was probable cause to imprison him. This was a disputed issue of fact which should have been left to the jury.

The error became harmless, however, because the jury's later verdict in context of the related false arrest claim made it clear that Hall was falsely imprisoned. By finding that Judge and Ochs had falsely arrested Hall, the jury necessarily rejected the officers' claim that they had probable cause to make the arrest. *See* Mass.Gen.Laws ch. 231, § 94A (1984) (probable cause a defense to suit for false imprisonment). Murphy has never contended, nor are there grounds for his doing so, that events at the station house provided additional information of Hall's alleged wrongdoing. Hall's detention at the station house was, therefore, without probable cause and was illegal. By taking an active role in Hall's station house detention, Murphy was liable for the false imprisonment pursuant to Mass.Gen.Laws ch. 263, § 3.

Murphy argues that he had no reason to know that Hall had been falsely arrested. I do not read Massachusetts law as providing him with a good faith defense. Up through the 1950's, an officer who arrested someone for a misdemeanor would be liable for false imprisonment if the arrestee did not actually commit the offense. "A mistaken belief on the part of the actor, whether induced by mistake of law or of fact and however reasonable ... does not confer a privilege to arrest." *Muniz v. Mehlman,* 327 Mass. 353, 358, 99 N.E.2d 37, 40 (1951). The Massachusetts legislature subsequently provided the arresting officer with a greater degree of protection, allowing him to defend against a false imprisonment suit arising out of a misdemeanor arrest by asserting probable cause. Mass.Gen.Laws ch. 231, § 94A. This provision, however, does not speak in terms of good faith.

By contrast, Mass.Gen.Laws ch. 236, § 3, provides a narrow good faith defense to

those officers who, in the performance of their duties, participated in a false arrest. The statute, however, expressly carves out from the good faith protection those officers who assumed an "active part" in the arrest or imprisonment. Because Murphy falls into the latter category, Massachusetts law has not granted him a good faith defense to this false imprisonment suit. Due to the jury's finding that a false arrest had in fact occurred, Murphy was properly held accountable to Hall for the resulting damages. Thus, I concur in the court's upholding of the district court's judgment against Murphy even though I do not agree with its rationale.