NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13284

LOUISE BARRON & others[1]  vs.  DANIEL L. KOLENDA[2] & another.[3]


Worcester.     November 2, 2022. – March 7, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker,
& Wendlandt, JJ.


Open Meeting Law.  Municipal Corporations, Open meetings,
     Selectmen, Governmental immunity.  Constitutional Law,
     Right to assemble, Right to petition government, Freedom of
     speech and press.  Governmental Immunity.  Massachusetts
     Civil Rights Act.  Civil Rights, Availability of remedy,
     Immunity of public official.  Declaratory Relief.



Civil action commenced in the Superior Court Department on
April 3, 2020.

The case was heard by Shannon Frison, J., on a motion for
judgment on the pleadings.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Ginny Sinkel Kremer for the plaintiffs.
John J. Davis for the defendants.

_____

[1] Jack Barron and Arthur St. Andre.

[2] Individually and as a member of the board of selectmen of
Southborough.

[3] Town of Southborough.

The following submitted briefs for amici curiae:

John Foskett for Massachusetts Association of School Committees.

Ruth A. Bourquin for American Civil Liberties Union of Massachusetts, Inc.

Maura E. O'Keefe, Town Counsel, & Rosemary Crowley for Massachusetts Municipal Lawyers Association.

Frank J. Bailey, Selena Fitanides, & John C. La Liberte for PioneerLegal, LLC.

KAFKER, J. After objecting to open meeting law violations and other municipal actions in a public comment session at a meeting of the board of selectmen of Southborough (board), the plaintiff Louise Barron was accused of violating the board's "public participation at public meetings" policy (public comment policy or civility code) and eventually threatened with physical removal from the meeting. Thereafter, she and two other plaintiffs brought State constitutional challenges to the policy, claiming in particular that she had exercised her constitutionally protected right under art. 19 of the Massachusetts Declaration of Rights "to assemble, speak in a peaceable manner, and petition her town leaders for redress."

In the plaintiffs' request for declaratory relief, seeking to have the public comment policy declared unconstitutional, they also used terminology associated with free speech claims brought under art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Constitution, and the First Amendment to the United States Constitution, although they voluntarily withdrew their First

Amendment and other Federal claims, eliminating the Federal constitutional basis that had justified removal of the case from State to Federal court.  Finally, Barron claims that the threat to remove her from the meeting for exercising her State constitutional rights violated the Massachusetts Civil Rights Act (MCRA), G. L. c. 12, §§ 11H-11I.

 For the reasons set forth infra, we conclude that the public comment policy of the town of Southborough (town) violates rights protected by art. 19 and, to the extent it is argued, art. 16.  Under both arts. 19 and 16, such civility restraints on the content of speech at a public comment session in a public meeting are forbidden.  Although civility, of course, is to be encouraged, it cannot be required regarding the content of what may be said in a public comment session of a governmental meeting without violating both provisions of the Massachusetts Declaration of Rights, which provide for a robust protection of public criticism of governmental action and officials.  What can be required is that the public comment session be conducted in an "orderly and peaceable" manner, including designating when public comment shall be allowed in the governmental meeting, the time limits for each person speaking, and rules preventing speakers from disrupting others, and removing those speakers if they do.  We have concluded that such time, place, and manner restrictions do not violate either

the right to assembly under art. 19 or the right to free speech under art. 16. See Desrosiers v. Governor, 486 Mass. 369, 390-391 (2020), cert. denied, 142 S. Ct. 83 (2021) (permitting time, place, and manner restrictions under art. 19); Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188, 197-198 (2005) (discussing time, place, and manner restrictions under art. 16).

Furthermore, when Barron alleged that the chair threatened to have her physically removed from a public comment session of a public meeting after she criticized town officials about undisputed violations of the open meeting laws, she properly alleged that he threatened to interfere with her exercise of State constitutional rights protected by arts. 16 and 19 in violation of the MCRA. There is also no qualified immunity, as there is a clearly established State constitutional right under arts. 16 and 19 to object (and even to do so vigorously) to the violation of the law by government officials in a public comment session of a public meeting. We therefore reverse the Superior Court judgment entered in favor of board member Daniel L. Kolenda. We also direct the Superior Court to enter a judgment declaring the town's public comment policy unconstitutional in violation of arts. 19 and 16.[4]

---

[4] We acknowledge the amicus briefs submitted by the Massachusetts Association of School Committees; American Civil Liberties Union of Massachusetts, Inc.; Massachusetts Municipal Lawyers Association; and PioneerLegal, LLC.

Background.  1.  Public meeting.  We draw the facts from the plaintiffs' complaint, while also considering the board's public comment policy and the video recording of the board's December 4, 2018 meeting, both of which were included in the record and considered by the judge below.  See Mullins v. Corcoran, 488 Mass. 275, 281 (2021), quoting Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000) ("In deciding [a motion for judgment on the pleadings], all facts pleaded by the nonmoving party must be accepted as true. . . .  We also may rely on 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint'"); Rosenberg v. JPMorgan Chase & Co., 487 Mass. 403, 408 (2021) (in reviewing motion to dismiss, we may consider extrinsic documents plaintiff relied on in framing complaint).

Barron is a town resident and a longtime participant in local government.  The board consists of five elected members. Kolenda was a longtime member of the board.  The board is subject to "the Massachusetts open meeting law, G. L. c. 30A, §§ 18 and 20 (a), which generally requires public bodies to make their meetings, including 'deliberations,' open to the public." Boelter v. Selectmen of Wayland, 479 Mass. 233, 234 (2018).  The board's public comment policy outlines the public comment portion of its meetings where town residents may address the

board.[5]  In 2018, the Attorney General determined that the board

had committed dozens of open meeting law violations and ordered

_____

   [5] The public comment policy states in full:

   "The [board of selectmen] recognizes the importance of
   active public participation at all public meetings, at the
   discretion of the [c]hair, on items on the official agenda
   as well as items not on the official agenda.  All comments
   from the public should be directed to or through the
   [c]hair once the speaker is recognized, and all parties
   (including members of the presiding [b]oard) act in a
   professional and courteous manner when either addressing
   the [b]oard, or in responding to the public.  Once
   recognized by the [c]hair, all persons addressing the
   [b]oard shall state their name and address prior to
   speaking.  It is the role of the [c]hair to set time
   limitations and maintain order during public meetings, as
   it is important that the [b]oard allow themselves enough
   time to conduct their official town business.

   "If included on the meeting agenda by the [c]hair,
   '[p]ublic [c]omment' is a time when town residents can
   bring matters before the [b]oard that are not on the
   official agenda.  Comments should be short and to the
   point, with the [c]hair ultimately responsible to control
   the time available to individual speakers.  Except in
   unusual circumstances, any matter presented under '[p]ublic
   [c]omment' will not be debated or acted upon by the [b]oard
   at the time it is presented.

   "All remarks and dialogue in public meetings must be
   respectful and courteous, free of rude, personal or
   slanderous remarks.  Inappropriate language and/or shouting
   will not be tolerated.  Furthermore, no person may offer
   comment without permission of the [c]hair, and all persons
   shall, at the request of the [c]hair, be silent.  No person
   shall disrupt the proceedings of a meeting.

   "Finally, while it true that State law provides that the
   [c]hair may order a disruptive person to withdraw from a
   meeting (and, if the person does not withdraw, the [c]hair
   may authorize a constable or other officer to remove the
   person from the meeting), it is the position of the [board]
   that no meeting should ever come to that point."

each member of the board to attend in-person open meeting law training.

Barron attended the board's meeting on December 4, 2018, where Kolenda was acting as the chair.  The board members discussed a number of topics, including the town budget, which, if approved, would result in increased real estate taxes for town residents.  The board also discussed the possibility of elevating the town administrator to the position of town manager.  The board also briefly addressed the open meeting law violations.  During the discussion on this point, Kolenda stated that the board is "a group of volunteers," and further characterized its members as "public servants" who "do their best."

After approximately two and one-half hours of business, Kolenda announced that the board would be moving to public comment.  Kolenda then stated, paraphrasing from the public comment policy:

> "And before we go to public comment, just a reminder for anyone who wants to make public comment.  It's a time when town residents can bring matters before the board of selectmen that are not on the official agenda.  We do have these posted for all boards and committees.  Comments should be short and to the point and remarks must be respectful and courteous, free of rude, personal, or slanderous remarks, and the guidelines go on for a couple of pages, but if anyone has any questions on that feel free to ask us.  If not, public comment please."

Barron then approached the podium holding a sign that stated "Stop Spending" on one side and "Stop Breaking Open Meeting Law"

on the other.  Barron began her comments by critiquing the proposed budget increases, opining that the town "ha[d] been spending like drunken sailors" and was "in trouble."  She argued for a moratorium on hiring and inquired about the benefits of hiring a town manager as opposed to a town administrator. Kolenda responded that questions would not be answered as the board was "not going to have a back and forth discussion during public comment."  Barron began moving to her next topic of concern but another board member responded to her question, indicating that the issue of a town manager would be considered by a committee and "ha[d] nothing to do with [the] upcoming town meeting."

After the board member's response, Barron began to critique the board for its open meeting law violations.  Barron and Kolenda then had the following exchange:

> Barron:  "And the next thing I want to say is you said that you were just merely volunteers, and I appreciate that, but you've still broken the law with open meeting law, and that is not the best you can do.  And . . . when you say that . . . this is the best we could do, I know it's not easy to be volunteers in town but breaking the law is breaking the law and --"

> Kolenda:  "So ma'am if you want to slander town officials who are doing their very best --"

> Barron:  "I'm not slandering."

> Kolenda:  "-- then then we're gonna go ahead and stop the public comment session now and go into recess."

When Kolenda said the word "now," Barron interjected and, simultaneously to Kolenda saying, "go into recess," Barron stated, "Look, you need to stop being a Hitler." Barron continued: "You're a Hitler. I can say what I want." After Barron's second reference to Hitler, Kolenda said: "Alright, we are moving into recess. Thank you."

The audio recording on the public broadcast then stopped. A message on the screen stated, "The Board of Selectmen is taking a brief recess and will return shortly," but the video recording continued to show the board members for approximately thirteen seconds.

Kolenda turned off his microphone, stood up, and began pointing in Barron's direction, repeatedly yelling at her, "You're disgusting!" Kolenda told Barron that he would have her "escorted out" of the meeting if she did not leave. Concerned that Kolenda would follow through with his threat, Barron left the meeting.

2. Procedural history. In April 2020, Barron, her husband, and a third resident of the town filed a complaint in the Superior Court alleging both Federal and State causes of action relating to the board's December 4, 2018 meeting. The defendants removed the case to Federal court, but it was remanded to the Superior Court after the plaintiffs withdrew the Federal claims. The plaintiffs' amended complaint sought a

judgment declaring that a portion of the policy was unconstitutional under the Massachusetts Declaration of Rights to the extent that the policy disallows criticism of the board members and their decisions. They also sought relief against Kolenda in his individual capacity under the MCRA, G. L. c. 12, §§ 11H-11I, for violation of art. 19.[6] Article 19 is the only provision of the Declaration of Rights that is expressly referenced in the complaint, although the request for declaratory relief is more open-ended and uses the terminology associated with free speech claims.

Prior to discovery, the defendants filed a motion for judgment on the pleadings. The motion was allowed as to all counts, and the plaintiffs appealed. We transferred the case here on our own motion.

Discussion. In the instant case, we are confronted with a State, not a Federal, constitutional challenge. It is also a

---

[6] The plaintiffs also brought an MCRA claim against Kolenda in his official capacity; MCRA claims against two other board members in their official and individual capacities; and claims against the board members for violating the open meeting law. Barron individually brought several common-law claims against Kolenda. The judge dismissed all of Barron's and the plaintiffs' claims. On appeal, the plaintiffs challenge only the dismissals of their claim for a declaratory judgment and the MCRA claim against Kolenda. The plaintiffs do not argue against the dismissal of the MCRA claim against Kolenda in his official capacity. Consequently, we do not review the dismissal of the other claims. See Lyons v. Secretary of the Commonwealth, 490 Mass. 560, 593 n.42 (2022) (claims not argued in brief are waived).

challenge expressly premised on art. 19, a provision that has not been the focus of much attention in recent case law, despite its illustrious past. Notably, this provision has served an important, independent purpose for much of the history of Massachusetts government, as there was no free speech provision in the original Declaration of Rights. In fact, such a provision was not added to the Massachusetts Constitution until 1948, when it was amended to include express free speech protections. See art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments to the Constitution.

As the text of art. 19, which was drafted by John Adams with some assistance from his cousin Samuel Adams,[7] along with its illuminating constitutional history, is directly applicable and dispositive of the claims here, we focus on art. 19 first. Because the request for declaratory relief is more open-ended and uses the terminology associated with art. 16 and First Amendment claims, we address art. 16 as well.

1. Standard of review. "We review the allowance of a motion for judgment on the pleadings de novo." Mullins, 488 Mass. at 281. We accept as true "all facts pleaded by the

---

[7] The Adams cousins were two of the three members of the subcommittee at the constitutional convention charged with drafting the Massachusetts Constitution. See S.E. Morison, History of the Constitution of Massachusetts 20 (1917).

nonmoving party" and "draw every reasonable inference in [that party's] favor" to determine whether the "factual allegations plausibly suggest[]" that the nonmoving party is entitled to relief. Id., quoting UBS Fin. Servs., Inc. v. Aliberti, 483 Mass. 396, 405 (2019). This standard applies to our review of the allowance of the motion for judgment on the pleadings with regard to the claim of a violation of the MCRA. Our review of the request for a declaratory judgment, however, differs. The plaintiffs seek a declaration that the town's public comment policy is unconstitutional. We review this as a facial challenge based on the uncontested language of the policy itself. This presents a question of law for the court requiring de novo review. See Commonwealth v. McGhee, 472 Mass. 405, 412 (2015) (facial challenge to statute "present[s] questions of law that we review de novo").

2. Article 19. The text of art. 19 provides: "The people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good; give instructions to their representatives, and to request of the legislative body, by the way of addresses, petitions, or remonstrances, redress of the wrongs done them, and of the grievances they suffer." As written, this provision expressly envisions a politically active and engaged, even aggrieved and angry, populace.

The text of art. 19 thus encompasses the plaintiffs' complaint here. Barron assembled with others at the public comment session of the board meeting to request redress of the wrongs they claimed had been done to them and the grievances they claimed to have suffered by town official actions, including the town's noncompliance with the open meeting law.

The text of this provision has also not been interpreted to be limited to State representatives or legislative bodies, despite some wording to that effect, but rather has been interpreted to be directed at the people's interaction with government officials more generally, including in particular town officials. See Kobrin v. Gastfriend, 443 Mass. 327, 333 (2005) (statutory right to petition is coextensive with art. 19 and applies where "a party seeks some redress from the government"); MacKeen v. Canton, 379 Mass. 514, 521-522 (1980) (evaluating whether town meeting procedures were consistent with art. 19); Fuller v. Mayor of Medford, 224 Mass. 176, 178 (1916) (right to assemble under art. 19 "enable[s] the [town] voters to have full and free discussion and consultation upon the merits of candidates for public office and of measures proposed in the public interests").

The provision also has a distinct, identifiable history and a close connection to public participation in town government that is uniquely informative in this case. As more fully

explained infra, art. 19 reflects the lessons and the spirit of the American Revolution. The assembly provision arose out of fierce opposition to governmental authority, and it was designed to protect such opposition, even if it was rude, personal, and disrespectful to public figures, as the colonists eventually were to the king and his representatives in Massachusetts.

Our interpretation of the text, history, and purpose of art. 19 is further informed by the words and actions of Samuel and John Adams, who not only theorized and commented upon the right, but were historic actors well versed in its application during the revolutionary period, particularly in the towns. Both Adams cousins emphasized in their correspondence and their actions the importance of the right to assemble. See Bowie, The Constitutional Right of Self-Government, 130 Yale L.J. 1652, 1727-1728 (2021). Samuel Adams wielded it to great effect in his attempt to "procure a Redress of Grievances" when the British governor of the colony attempted to exercise control over assemblies after the Boston Massacre. Id. at 1680, quoting Report of the Committee to Prepare an Answer to Thomas Hutchinson's Speech (July 31, 1770), in 47 Journals of the House of Representatives of Massachusetts 1770-1771, at 63, 69 (1978).

More philosophically, John Adams explained that the right of assembly was a most important principle and institution of self-government, as it allowed "[every] Man, high and low . . .

[to speak his senti]ments of public Affairs."  Bowie, supra at 1708, quoting Letter from John Adams to Edmé Jacques Genet (May 28, 1780), in 9 Papers of John Adams 350, 353 (G.L. Lint et al. eds., 1996).  Town inhabitants, he wrote, "are invested with . . . the right to assemble, whenever they are summoned by their selectmen, in their town halls, there to deliberate upon the public affairs of the town."  Letter from John Adams to the Abbé de Mably (1782), in 5 Works of John Adams 492, 495 (C.F. Adams ed. 1851).  "The consequences" of the right of assembly, in Adams's words, were that "the inhabitants . . . acquired . . . the habit of discussing, of deliberating, and of judging of public affairs," and thus, "it was in these assemblies of towns . . . that the sentiments of the people were formed . . . and their resolutions were taken from the beginning to the end of the disputes . . . with Great Britain."  Id.  Alexis de Tocqueville made a similar point in Democracy in America: "Town-meetings are to liberty what primary schools are to science; they bring it within the people's reach, they teach men how to use and how to enjoy it."  1 A. de Tocqueville, Democracy in America 55 (H. Reeve trans. 1862).

Our own case law interpreting art. 19 confirms Adams's insights regarding the critical role of the right of assembly in the towns in cultivating the spirit and practice of self-

government.  As Justice Rugg wrote in Wheelock v. Lowell, 196

Mass. 220, 227 (1907):

>    "It is hard to overestimate the historic significance and
>    patriotic influence of the public meetings held in all the
>    towns of Massachusetts before and during the Revolution.
>    No small part of the capacity for honest and efficient
>    local government manifested by the people of this
>    Commonwealth has been due to the training of citizens in
>    the form of the town meeting.  The jealous care to preserve
>    the means for exercising the right of assembling for
>    discussion of public topics . . . demonstrates that a vital
>    appreciation of the importance of the opportunity to
>    exercise the right still survives."

From the beginning, our cases have also emphasized that

"the fullest and freest discussion" seems to be "sanctioned and

encouraged by the admirable passage in the constitution,"

Commonwealth v. Porter, 1 Gray 476, 478, 480 (1854), so long as

the right is exercised in "an orderly and peaceable manner," id.

at 478.  In fact, the drafters of art. 19 tracked the language

of the Pennsylvania Constitution but with the specific addition

of the clause providing that such assembly shall be done "in an

orderly and peaceable manner."  Bowie, 130 Yale L.J. at 1707.

Further clarifying the type of limitations that ensure an

"orderly and peaceable" assembly, our more recent case law has

drawn on well-understood First Amendment principles and provided

for reasonable time, place, and manner restrictions.  As we

stated:

>    "States may impose reasonable restrictions on the time,
>    place, or manner of protected speech and assembly 'provided
>    the restrictions "are justified without reference to the
>    content of the regulated speech, that they are narrowly

tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."'"

Desrosiers, 486 Mass. at 390-391, quoting Boston v. Back Bay Cultural Ass'n, 418 Mass. 175, 178-179 (1994).

3. The application of art. 19 to the civility code. The question then becomes whether the enforcement of the town's civility code passes muster under art. 19. The code provides:

"All remarks and dialogue in public meetings must be respectful and courteous, free of rude, personal, or slanderous remarks. Inappropriate language and/or shouting will not be tolerated. Furthermore, no person may offer comment without permission of the [c]hair, and all persons shall, at the request of the [c]hair, be silent. No person shall disrupt the proceedings of a meeting."

As explained supra, the text, history, and case law surrounding art. 19 provide for the "fullest and freest" discussion of public matters, including protection of fierce criticism of governmental action and actors, so long as that criticism is done in a peaceable and orderly manner and is consistent with time, place, and manner restrictions. Porter, 1 Gray at 478. See Desrosiers, 486 Mass. at 390-391. "Peaceable and orderly" is not the same as "respectful and courteous." There was nothing respectful or courteous about the public assemblies of the revolutionary period. There was also much that was rude and personal, especially when it was directed at

the representatives of the king and the king himself.[8]  See

Bowie, 130 Yale L.J. at 1677 ("in London, a columnist called

Boston's town meetings a 'declaration of war' and criticized

Boston's leaders for 'working up the populace to such a frenzy

of rage'").

Here, the town expressly provided a place for public

comment:  the meeting of the board.  The town also set the time,

after the conclusion of the regular meeting, as was the town's

right.  Barron presented her grievances at the established time

and place.[9]  The town nonetheless then sought to control the

content of the public comment, which directly implicates and

restricts the exercise of the art. 19 right of the people to

request "redress of the wrongs done them, and of the grievances

---

[8] The policy's prohibition on slander raises a different set
of questions that we need not resolve here.  In Commonwealth v.
Surridge, 265 Mass. 425, 427 (1929), this court expressly carved
out slander from protection under art. 19.  However, at least
under First Amendment principles, slander directed at public
officials requires actual malice.  See Edwards v. Commonwealth,
477 Mass. 254, 263 (2017), S.C., 488 Mass. 555 (2021), citing
New York Times Co. v. Sullivan, 376 U.S. 254, 279-280 (1964).

[9] A manner regulation restricts the way in which a speaker
communicates, i.e., the medium of communication or aspects of
that medium like the size of signs or the volume of audio.  See
Regan v. Time, Inc., 468 U.S. 641, 656 (1984) (plurality
opinion) (manner regulations include "size and color
limitations" on photographs, "decibel level restrictions," and
"size and height limitations on outdoor signs"); Back Bay
Cultural Ass'n, 418 Mass. at 183 (ban on "forms of
entertainment" that "create the type of noise the city
legitimately seeks to eliminate" would be permissible).  We are
not presented with disputed manner restrictions in the instant
case.

they suffer."[10]  The content sought to be prohibited --
discourteous, rude, disrespectful, or personal speech about
government officials and governmental actions -- is clearly
protected by art. 19, and thus the prohibition is impermissible.
In sum, the town's civility code is contradicted by the letter
and purpose of art. 19.[11]

_____

[10] This is not a case in which the public meeting was
limited to a particular item or items.  Although that would be
content based, in order to function efficiently, towns must be
able to hold public meetings limited to a particular subject
without violating art. 19, so long as the town provides other
opportunities to exercise this right, as it did in the instant
case.  Cf. Madison Joint Sch. Dist. No. 8 v. Wisconsin
Employment Relations Comm'n, 429 U.S. 167, 175 n.8 (1976)
("Plainly, public bodies may confine their meetings to specified
subject matter and may hold nonpublic sessions to transact
business").

[11] Given the detailed and emphatic text, history, and case
law, there is no reason to conclude that the State
constitutional right protected by art. 19 would be any less
protective than the right of assembly protected by the First
Amendment.  Throughout most of its history, the right of
assembly clause in the First Amendment, although not interpreted
as being "identical" to the right of free speech, has not been
given much independent significance.  See National Ass'n for the
Advancement of Colored People v. Claiborne Hardware Co., 458
U.S. 886, 911-912 (1982); Thomas v. Collins, 323 U.S. 516, 530
(1945) (rights to freedom of speech, assembly, and press,
"though not identical, are inseparable").  See also Blackhawk,
Lobbying and the Petition Clause, 68 Stan. L. Rev. 1131 (2016);
Bowie, 130 Yale L.J. at 1655; El-Haj, The Neglected Right of
Assembly, 56 UCLA L. Rev. 543 (2009); Inazu, The Forgotten
Freedom of Assembly, 84 Tul. L. Rev. 565, 570 (2010).  Although
the Supreme Court's more recent decision in Duryea v. Guarneri,
564 U.S. 379, 394 (2011), somewhat reinvigorated the provision,
Blackhawk, supra at 1181, the vigor of art. 19 is unquestionable
as reflected in its text, history, and case law.  Indeed, the
clear thrust of that text, history, and case law interpreting
art. 19 compels the conclusion that the town's civility code is
unconstitutional.

4.  Article 16.  Assuming that the request for declaratory relief also includes a claim based on art. 16, as well as art. 19, we also conclude that art. 16 is violated.

In their request for declaratory relief, the plaintiffs state:

> "The [c]ourt should declare that the [d]efendants may not regulate protected speech during any time period designated for speech by the public based on the content of the message of the speaker, the view point of the speaker, or their desire to avoid criticism, ensure 'proper decorum', or avoid 'personal' or derogatory or even defamatory statements, unless such regulation is the least restrictive means necessary to achieve a compelling government interest."

Our cases interpreting art. 16 clearly support this request for relief.  They also do so without any need to survey, as the parties do, the contested Federal case law distinguishing limited and designated public forums and the different standards of review applicable to these forums under the First Amendment. As this court expressly stated in Walker v. Georgetown Hous. Auth., 424 Mass. 671, 675 (1997):  "We need not decide whether we would find the [United States] Supreme Court's public, nonpublic, and limited public forum classifications instructive in resolving free speech rights under our Declaration of Rights" in the instant case.  Indeed, "we need not enter that fray because, under our Declaration of Rights, the applicable standard for content-based restrictions on political speech is clearly strict scrutiny."  Commonwealth v. Lucas, 472 Mass. 387,

397 (2015). See Massachusetts Coalition for the Homeless v. Fall River, 486 Mass. 437, 441-442 (2020) (holding that strict scrutiny applies to content-based regulation of protected speech); Bachrach v. Secretary of the Commonwealth, 382 Mass. 268, 276 (1981) ("As a substantial restriction of political expression and association . . . the legislation at bar should attract 'strict scrutiny'").[12]

There is no question that this civility code is directed at political speech, as it regulates speech in a public comment session of a meeting of the board, and that it is content based, as it requires us to examine what was said. See Opinion of the Justices, 436 Mass. 1201, 1206 (2002) ("if the applicability of

---

[12] As we apply strict scrutiny here, the protection provided by the State Constitution is at least as great if not greater than the protection provided by the First Amendment for content-based governmental restrictions. As noted supra, we are not confronted with a public meeting limited to a particular item or items. We recognize that even though a public meeting limited to a particular purpose may require a content-based restriction on comments, government must be able to hold such meetings to function efficiently. Whether the government's right to hold such meetings satisfies strict scrutiny or some lesser standard under art. 16, we need not decide. Cf. Rowe v. Cocoa, 358 F.3d 800, 803 (11th Cir. 2004) ("There is a significant governmental interest in conducting orderly, efficient meetings of public bodies," which may be done via "confin[ing] their meetings to specified subject matter"); White v. Norwalk, 900 F.2d 1421, 1425 (9th Cir. 1990) ("the Council does not violate the first amendment when it restricts public speakers to the subject at hand"); Smith vs. Middletown, U.S. Dist. Ct., No. 3:09-CV-1431 (D. Conn. Sept. 1, 2011), aff'd sub nom. Smith v. Santangelo, 518 Fed. Appx. 16 (2d Cir. 2013) ("The restriction of public comment to items on the agenda is also reasonable because it . . . facilitate[s] the official business of the Council").

the bill's requirements can only be determined by reviewing the contents of the proposed expression, the bill is a content-based regulation of speech").  As such, it must withstand strict scrutiny, which means it must be "both 'necessary to serve a compelling [S]tate interest and . . . narrowly drawn to achieve that end.'"  Lucas, 472 Mass. at 398, quoting Opinion of the Justices, supra.  It is neither.  Although civility can and should be encouraged in political discourse, it cannot be required.  In this country, we have never concluded that there is a compelling need to mandate that political discourse with those with whom we strongly disagree be courteous and respectful.  Rather, we have concluded that political speech must remain "uninhibited, robust, and wide-open."  Van Liew v. Stansfield, 474 Mass. 31, 39 (2016), quoting New York Times Co. v. Sullivan, 374 U.S. 254, 270 (1964).  This civility code is also drafted with an extraordinarily broad brush.  It is certainly not narrowly tailored.

Finally, the policy's requirement that the speech directed at government officials "be respectful and courteous, [and] free of rude . . . remarks" appears to cross the line into viewpoint discrimination:  allowing lavish praise but disallowing harsh criticism of government officials.[13]  As the Supreme Court has

_____

[13] At the same time, as between members of the public taking opposite positions, a requirement that the comments be respectful and courteous appears not to be viewpoint based, but

explained, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995). See Shurtleff v. Boston, 142 S. Ct. 1583, 1587 (2022) ("When the government encourages diverse expression -- say, by creating a forum for debate -- the [right to free speech] prevents it from discriminating against speakers based on their viewpoint"). Although we have not been required to precisely define what constitutes viewpoint discrimination in our case law, art. 16, like the First Amendment, certainly does not permit viewpoint discrimination. See Roman v. Trustees of Tufts College, 461 Mass. 707, 716-717 (2012); Opinion of the Justices, 430 Mass. 1205, 1209 (2000).[14]

A provision "that public officials [can] be praised but not condemned" is "the essence of viewpoint discrimination." Matal v. Tam, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring). Speech that politely praises public officials or their actions is allowed by the policy, but speech that rudely or

---

rather only content based. An example would be if a town official told both sides debating a tax increase to fully express their views but to do so courteously. Although still impermissible, because it is content based, the restriction would not be viewpoint based.

[14] The same is true for art. 19.

disrespectfully criticizes public officials or their actions is not.  This constitutes viewpoint discrimination.

In sum, this civility code is unconstitutional under art. 16 as well as art. 19.

5.  Overbreadth, vagueness, and permissible restrictions. In the instant case, we have not been asked, nor should we attempt on our own, to separate the unconstitutional from the constitutional aspects of the town's civility code.  We conclude that it is so overbroad, so vague, and so subject to manipulation on its face that it is not salvageable or severable.  See Massachusetts Coalition for the Homeless, 486 Mass. at 447 (statute declared facially invalid under art. 16 in its entirety because we discerned an "unacceptable risk of a chilling effect"); Lucas, 472 Mass. at 404 (statute declared unconstitutional in its entirely because "even under a narrow construction, there is a genuine risk that the operation of [statute] will cast an unacceptable chill on core political speech").

This is not to say that restrictions cannot be imposed on public comment sessions consistent with arts. 16 and 19. Reasonable time, place, and manner restrictions could include designating when and where a public comment session may occur, how long it might last, the time limits for each person speaking

during the public comment session, and rules preventing speakers from disrupting others and removing those who do.

6. MCRA claim. We also have no difficulty concluding that the dismissal of the MCRA claim should be reversed. Taking the facts in the light most favorable to the plaintiffs, Kolenda "interfere[d]" with Barron's clearly established constitutional right under arts. 19 and 16 via "threats, intimidation or coercion." G. L. c. 12, § 11H. As such, there was a violation of the MCRA and no qualified immunity.

"To establish a claim under the [MCRA], 'a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion.'" Glovsky v. Roche Bros. Supermkts., Inc., 469 Mass. 752, 762 (2014), quoting Currier v. National Bd. of Med. Examiners, 462 Mass. 1, 12 (2012). In the instant case, the video recording shows that, first, Barron complained about the open meeting law violations; then, Kolenda accused her of slander and said, "[W]e're gonna go ahead and stop the public comment session now"; next, Barron said, "[Y]ou need to stop being a Hitler"; and finally, Kolenda ended the meeting and the audio stopped. Subsequently, Kolenda stood up and started yelling and aggressively pointing at Barron. The plaintiffs' complaint alleges that Kolenda shouted, "You're disgusting," and

threatened to have her "escorted out" of the meeting.  The video recording does not show Barron after the end of the audio portion.

Taking the facts, including the video recording, in the light most favorable to the plaintiffs, Barron exercised her constitutional right under arts. 19 and 16 to address the meeting of the board and complain about the open meeting law violations.  Her comparison between Kolenda and Hitler was, at least in the light most favorable to the plaintiffs, simply hyperbole, describing Kolenda as behaving in a dictatorial manner, that is, domineering or authoritarian.  Although a comparison to Hitler is certainly rude and insulting, it is still speech protected by art. 16.[15]

---

[15] We note that personally insulting comments may rise to the level of fighting words, that is, "face-to-face personal insults that are so personally abusive that they are plainly likely to provoke a violent reaction and cause a breach of the peace," which are not protected speech.  O'Brien v. Borowski, 461 Mass. 415, 423 (2012).  See also Cohen v. California, 403 U.S. 15, 20 (1971) (fighting words are "personally abusive epithets which, when addressed to the ordinary citizen, are, as a matter of common knowledge, inherently likely to provoke violent reaction").  We have also explained that "the fighting words exception [to free speech] is 'an extremely narrow one.'" O'Brien, supra, quoting Johnson v. Campbell, 332 F.3d 199, 212 (3d Cir. 2003).  We further emphasize that elected officials are expected to be able to respond to insulting comments about their job performance without violence.  See Commonwealth v. Bigelow, 475 Mass. 554, 562 (2016) ("personal insults and allegations concerning [selectman's] alleged criminal past" were "constitutionally protected political speech" because "central thrust is criticism of him as a selectman").  Although not presented in the instant case, we recognize that fighting words from one public speaker may trigger a disturbance from another

In addition, the plaintiffs' allegations plausibly suggest that Barron's rights were interfered with via threats, intimidation, or coercion.  Kolenda's response is not fully captured by the video recording, but, accepting the plaintiffs' account as true, Kolenda told Barron to stop speaking, started screaming at her, and threatened to have her removed from the meeting in response to her protected speech.  If this is proved at trial, she could establish a violation of the MCRA.  See Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985) ("sufficient intimidation or coercion" where "security officer ordered [plaintiff] to stop soliciting and distributing his political handbills"); Sarvis v. Boston Safe Deposit & Trust Co., 47 Mass. App. Ct. 86, 93 (1999) (third element of MCRA satisfied where "defendants attempted to interfere with the plaintiffs' right to a summary process hearing by threatening them with arrest and then bringing about their arrests").

On the facts alleged, Kolenda is also not entitled to qualified immunity.  As we have explained:  "[G]overnment officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

member of the public, which may require action by government officials.

known."  LaChance v. Commissioner of Correction, 463 Mass. 767, 777 (2012), S.C., 475 Mass. 757 (2016), quoting Rodriques v. Furtado, 410 Mass. 878, 882 (1991).  More specifically, "[a] right is only clearly established if, at the time of the alleged violation, 'the contours of the right allegedly violated [were] sufficiently definite so that a reasonable official would appreciate that the conduct in question was unlawful.'"  LaChance, supra, quoting Longval v. Commissioner of Correction, 448 Mass. 412, 419 (2007).  Nevertheless, "it is not necessary for the courts to have previously considered a particular situation identical to the one faced by the government official."  Caron v. Silvia, 32 Mass. App. Ct. 271, 273 (1992).  "It is enough, rather, that there existed case law sufficient to clearly establish that, if a court were presented with such a situation, the court would find that the plaintiff's rights were violated."  Id., quoting Hall v. Ochs, 817 F.2d 920, 925 (1st Cir. 1987).  In the instant case, the contours of the rights are sufficiently clear, and a reasonable public official would understand that his response to the exercise of those rights was unlawful.

As discussed supra, the "full and free" discussion in town meetings protected by art. 19 has a long and distinguished history in Massachusetts.  Fuller, 224 Mass. at 178.  It is also well established that restrictions on the content of political

speech must be "necessary to serve a compelling [S]tate interest and . . . narrowly drawn to achieve that end" to satisfy the requirements of art. 16, Opinion of the Justices, 436 Mass. at 1206, and that viewpoint discrimination is absolutely prohibited, Rosenberger, 515 U.S. at 829.

At a public comment session in a meeting of the board, a resident of the town thus clearly has the right to accurately complain about violations of law committed by town officials and object to other town actions, including its spending practices, and to express her views vehemently, critically, and personally to the government officials involved.  Such a right is clearly protected by art. 19 as well as art. 16 for the reasons discussed supra.  When a government official responds to a resident's exercise of those rights by accusing her of slandering the board, screaming at her, and threatening her physical removal, it should be clear to him that his conduct is unlawful.  Thus, there is no basis for qualified immunity.

Conclusion.  The order of judgment on the pleadings is reversed, and the case is remanded for further proceedings consistent with this opinion, including entry of a judgment declaring that the town's public comment policy is unconstitutional.

So ordered.